UNITED STATES of America

v.

David Paul HAMMER.

No. 4:CR–96–239.

United States District Court,
M.D. Pennsylvania.

Oct. 9, 1998.

Frederick E. Martin, Office of U.S. Attorney, Williamsport, PA, for United States of America.

Ronald C. Travis, Rieders, Travis, Mussina, Humphrey and Harris, Williamsport, PA, Stephen Chadwick Smith, Lock Haven, PA, David A. Ruhnke, Ruhnke & Barrett, Montclaire, NJ, for David Paul Hammer.

## OPINION

MUIR, District Judge.

### I. Introduction.

On September 18, 1996, a Grand Jury sitting in Williamsport, Pennsylvania, returned an indictment charging Defendant David Paul Hammer with first degree murder. On April 9, 1997, the government filed a notice of its intent to seek the death penalty in this case. Mr. Hammer was charged with killing his cellmate, Andrew Marti, while housed in Cell 103 of the Special Housing Unit at the Allenwood United States Penitentiary, White Deer, Pennsylvania. The cause of death was strangulation with a cord braided from a bedsheet.

This case was placed on the May, 1998, trial list. Jury selection commenced on May 5, 1998, with a pool of 250 potential jurors and lasted fourteen (14) days. During that period an additional 205 potential jurors were needed. A jury of 12 jurors and 6 alternates was impaneled on June 2, 1998, and on the next day the government commenced its case. On June 11, 1998, the government rested and the defense commenced its case. The defense presented an insanity defense. Robert M. Sadoff, M.D., the defense forensic psychiatrist testified that Mr. Hammer suffered from multiple personality disorder or as it is now designated dissociative identity disorder. Dr. Sadoff further testified that Mr. Hammer has four alter personalities: (1) Jocko, a violent personality, (2) Tammy, a female personality, (3) Wilbur, a child personality and (4) Jasper, a chimpanzee. In sum, Dr. Sadoff testified that Jocko committed the killing of Mr. Marti and that Mr. Hammer was not legally responsible for the killing. On June 17, 1998, the defense rested and the government commenced its rebuttal

case by calling James K. Wolfson, M.D., a forensic psychiatrist employed at the Medical Center for Federal Prisoners, Springfield, Missouri. Dr. Wolfson's testimony was the opposite of Dr. Sadoff, i.e., Mr. Hammer did not suffer from dissociative identity disorder and that he was responsible for his actions.

On June 22, 1998, before the cross-examination of Dr. Wolfson was completed, the court was notified that Mr. Hammer desired to plead guilty. Before entering into a guilty plea colloquy with Mr. Hammer, the court required Mr. Hammer to be evaluated to determine whether he was competent to plead guilty. That evaluation was conducted by Dr. Wolfson and John R. Mitchell, Psy.D., a psychologist at the Allenwood United States Penitentiary, White Deer, Pennsylvania. The court than heard testimony from both Drs. Wolfson and Mitchell which established that Mr. Hammer was competent to enter a guilty plea.

On June 22, 1998, Mr. Hammer entered a plea of guilty to the intentional premeditated murder of Mr. Marti in violation of 18, United States Code, Section 1111. As a result of the guilty plea, the penalty phase of the trial commenced on June 30, 1998. On July 23, 1998, the jury retired to deliberate on its

verdict and on the next day recommended that Mr. Hammer be sentenced to death.

■ The evidence presented during the trial viewed in a light most favorable to the government [1] establishes that Mr. Hammer bound each limb of Mr. Marti by using the ruse that he would only slightly injure Mr. Marti and obtain a transfer for Mr. Marti to another prison. Mr. Hammer after rendering Mr. Marti helpless put Mr. Marti in a sleeper hold. Testimony from a pathologist established that Mr. Marti struggled in the restraints. Once Mr. Marti was rendered unconscious by the sleeper hold, Mr. Hammer strangled him with a homemade cord. In recommending a sentence of death the jury, as required by statute, found that the government established beyond a reasonable doubt that Mr. Hammer intentionally killed Mr. Marti.[2] The jury also found beyond a reasonable doubt the following two statutory aggravating factors: (1) Mr. Hammer previously had been convicted of two or more State or Federal offenses punishable by a term of imprisonment for more than one year and (2) Mr. Hammer committed the murder of Mr. Marti after substantial planning and premeditation. These two statutory aggravating factors are supported by the record.[3]

---

**1.** In reviewing the record to determine whether the decision of the jury is justified, the evidence must be viewed in a light most favorable to the government. See *United States v. Villard,* 885 F.2d 117, 120 (3d Cir.1989). If this case is appealed by Mr. Hammer to the Court of Appeals for the Third Circuit, the Court of Appeals is required by statute to review, inter alia, the evidence submitted during the trial and determine "whether the evidence supports the special finding of the existence of an aggravating factor ...." 18 U.S.C. § 3595(b) and (c). Because Mr. Hammer has stated that he desires to forego an appeal and be executed expeditiously, it seems appropriate for us to review the record to determine whether the jury's recommendation is supported by the evidence.

**2.** Even if a defendant pleads guilty to first degree murder or is found guilty of first degree murder, which requires a finding beyond a reasonable doubt of premeditation and malice aforethought, during the penalty phase of the trial the government pursuant to 18 U.S.C. § 3591(a)(2) is required to convince the jury beyond a reasonable doubt that the defendant either
(1) intentionally killed the victim;
(2) intentionally inflicted serious bodily injury that resulted in the death of the victim;

(3) intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act; or
(4) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act.
This statutory requirement appears to provide a defendant with "a second bite at the apple."

**3.** The government in its notice of intent to seek the death penalty also set forth as statutory aggravating factors the following:

(1) Mr. Hammer committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim; and
(2) Mr. Marti was particularly vulnerable because of infirmity.
We concluded the evidence relating to those two statutory aggravating factors was insufficient and did not permit the jury to consider them.

Mr. Hammer was convicted in 1978 and 1984 in Oklahoma state court of felonies involving the use of weapons. The 1984 conviction involved a shooting with intent to kill. As for substantial planning and premeditation, the testimony of inmate witnesses as well as the evidence of the preparation of the homemade cord establish beyond a reasonable doubt that statutory aggravating factor. The jury also found the following two non-statutory aggravating factors: (1) Mr. Hammer represents a continuing danger to the lives and safety of others in the future because he is likely to commit criminal acts of violence, and (2) Mr. Hammer caused harm to the family of Mr. Marti as a result of the impact of the killing upon the family. These two non-statutory aggravating factors are supported by the record. Documents written by Mr. Hammer as well as his tape recorded statement to a news reporter establish beyond a reasonable doubt that he represents a continuing danger to the lives and safety of others in the future. Also, in one document Mr. Hammer stated that if given the chance he would kill again. As for the harm to the family of Mr. Marti, based on the testimony of family members there is no doubt that such harm was inflicted.

The jury after finding two statutory and two non-statutory aggravating factors then considered whether any mitigating factors existed. One juror found that Mr. Hammer committed the offense under severe mental or emotional disturbance, suffers from cognitive deficits, is remorseful for having caused the death of Mr. Marti and has demonstrated acceptance of responsibility for his offense. Twelve jurors found that Mr. Hammer is the product of a violent, abusive and chaotic childhood, that as a young person he attempted to seek help for mental difficulties,

that he will be sentenced to life in prison without the possibility of release if a sentence of death is not imposed, and friends and family members of Mr. Hammer will be adversely affected if he is sentenced to death. Six jurors found that as a child Mr. Hammer was a victim of sexual abuse. Three jurors found that the United States Bureau of Prisons and the Oklahoma Department of Corrections are capable of fashioning conditions of confinement such that Mr. Hammer is unlikely to commit criminal acts of violence in the future. Finally, five jurors found that Mr. Hammer even though incarcerated for most of his life has managed to do some good things.

The jurors then balanced the aggravating factors against the mitigating factors and concluded that because the aggravating factors sufficiently outweighed the mitigating factors a sentence of death was justified.[4] The recommendation of the jury is supported by the evidence presented during the trial.

On Friday, July 31, 1998, Mr. Hammer filed a document entitled "Defendant's Pro Se Motion for the Discharge of Court Appointed Counsel; and Request For Immediate Sentencing." In that document Mr. Hammer states that he "has no desire to file any post trial motions or to pursue any appeals of the jury's verdict or the sentence to be imposed." On August 3, 1998, a hearing was held on Mr. Hammer's motion at which time Mr. Hammer addressed this court and repeated his requests that counsel be discharged and sentence be imposed immediately. The government responded by requesting a competency examination. On August 4, 1998, an order was issued directing that Mr. Hammer undergo a competency evaluation at

---

4. Part Six of the Special Findings Form Regarding the Punishment to be Imposed Upon David Paul Hammer for the Killing of Andrew Marti required each juror to sign an Understanding which stated as follows:

We understand that we are to consider whether the aggravating factor or factors unanimously found by us to exist sufficiently outweigh any mitigating factor or factors found to exist to justify a sentence of death, or in the absence of mitigating factors, whether the aggravating factor or factors are themselves sufficient to justify a sentence of death. We also understand that a finding with respect to a mitigating factor may be made by any one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such factor established for purposes of his or her weighing of the aggravating factor or factors and mitigating factor or factors regardless of the number of jurors who concur that a particular mitigating factor has been established. We also understand that a jury is never required to impose a death sentence and that a sentence of death cannot be imposed except by unanimous vote.

the Medical Center for Federal Prisoners, Springfield, Missouri.

On August 5, 1998, counsel for Mr. Hammer filed a motion to withdraw as counsel, or in the alternative for the appointment of additional counsel. By order of August 10, 1998, we denied the motion to withdraw but appointed Stephen C. Smith, Esquire, as additional counsel. By order of September 1, 1998, we continued the date for imposition of sentence originally set for September 17, 1998, until after the competency evaluation of Mr. Hammer was completed and a hearing had been held to determine Mr. Hammer's competency to discharge his counsel and waive his appeal rights.

Mr. Hammer's motion to discharge counsel and waive his appeal rights has been fully briefed and a hearing was held thereon on October 1, 1998. At that hearing James K. Wolfson, M.D., and John R. Mitchell, Psy.D., reappeared and testified regarding Mr. Hammer's mental state and competency to discharge counsel and waive his appeal rights. At the conclusion of the testimony of Drs. Mitchell and Wolfson, we entered into an extensive colloquy with Mr. Hammer. Therefore, the motion is ripe for decision. We will also address in this opinion our basis for denying certain penalty phase jury instructions proposed by Mr. Hammer and his motion for a mistrial which was requested after the court interrupted on two occasions the closing argument of defense attorney Ruhnke. The following are the court's findings of fact, discussion and conclusions of law relating to the hearing held on October 1, 1998.

## II. Findings of Fact.

1. During his various appearances before this Court over the past two years, Mr. Hammer did not act in any fashion which suggested that he was incompetent.

2. None of the defense experts, including Drs. Sadoff and Gelbort who testified at trial, suggested that Mr. Hammer was incompetent at any time. (Undisputed, hereinafter "U")[5]

3. None of the three forensic evaluations conducted in Mr. Hammer's cases beginning in 1978 and continuing through 1997 suggested that Mr. Hammer was incompetent in various criminal prosecutions which he faced including the instant one. (U)

4. None of the psychiatrists or psychologists who also testified at trial, Drs. Mitchell, Karten, and Wolfson, suggested that Mr. Hammer was during the time frames when they saw him, 1995 through 1997, incompetent. (U)

5. Mr. Hammer since July 24, 1998, when the jury returned its recommendation, repeatedly has praised attorneys Ruhnke and Travis for their assistance on his behalf.

6. Following July 24, 1998, Mr. Hammer, in writing, requested the termination of defense counsel's services as an initial step to being promptly executed as was recommended by the jury. (U)

7. In all of his written submissions or briefs to this Court since July 24, 1998, Mr. Hammer appears to be competent.

8. On July 31, 1998, Mr. Hammer filed a pro se motion seeking to discharge court-appointed counsel Travis and Ruhnke. (U)

9. Mr Hammer's pro se motion also asked the Court to strike the post-trial motions filed by attorneys Travis and Ruhnke. (U)

10. Mr. Hammer's pro se motion also asks the Court to set a date for immediate formal sentencing. (U)

11. A hearing on Mr. Hammer's pro se motion was held on August 3, 1998.(U)

12. At the hearing on August 3, 1998, the government requested that the Court order a psychiatric or psychological evaluation of Mr. Hammer pursuant to 18 U.S.C. §§ 4241(a) and 4247(b) and (c). (U)

13. Mr. Hammer has been incarcerated, with the exception of the several times where he was in escape status, for over twenty years. (U)

---

**5.** This finding of fact was designated by all counsel as undisputed. However, the Court is of the opinion that counsel may have incorrectly designated the finding undisputed. Dr. Sadoff's testimony that Mr. Hammer was controlled by Jocko at the time of the murder would suggest that he was incompetent at least at the time of the murder.

14. Mr. Hammer, even if the jury had not made its recommendation of July 24, 1998, still faces 1210 years of imprisonment as a result of his criminal convictions in Oklahoma State Court. (U)

15. In one of his written requests to discharge counsel, Mr. Hammer refers to the Roman Philosopher Seneca as well as the German philosopher Neitsche in observing that his desire to accept imposition of the death sentence is a rational one under the circumstances in his particular case.

16. On August 3, 1998, Dr. John Mitchell spoke at length with Mr. Hammer at the Allenwood Penitentiary regarding Mr. Hammer's mental state and competence.

17. Dr. James Wolfson, who became familiar with Mr. Hammer during an evaluation at the Medical Center for Federal Prisoners in November and December 1997, interviewed Mr. Hammer in August and September, 1998, regarding Mr. Hammer's mental state and especially his competence to waive counsel. (U)

18. Dr. Wolfson is a highly qualified psychiatrist and is a Diplomate of the American Board of Psychiatry and Neurology with Added Qualification in Forensic Psychiatry.

19. Dr. Mitchell is a highly qualified psychologist.

20. Both Drs. Mitchell and Wolfson on these different occasions and locations reached consensus on a number of matters. (U)

21. Drs. Mitchell and Wolfson agreed that Mr. Hammer was alert and oriented to person, place and time. (U)

22. Drs. Mitchell and Wolfson agreed that Mr. Hammer's thinking was logical and coherent and there was no evidence of a thought disorder. (U)

23. Drs. Mitchell and Wolfson agreed that Mr. Hammer's attention and concentration were good and there was no evidence of memory impairment. (U)

24. Drs. Mitchell and Wolfson agreed that Mr. Hammer's affect was broad in range and he displayed a reflectiveness and confidence emotionally.

25. Drs. Mitchell and Wolfson agreed that Mr. Hammer denied hallucinations and there were no signs of delusional thinking by him.

26. Drs. Mitchell and Wolfson agreed that neither they nor staff either at Allenwood or Springfield facilities observed Mr. Hammer to be experiencing hallucinations or delusions.

27. Drs. Mitchell and Wolfson agreed that Mr. Hammer denied being influenced by any other person to make his current decision. (U)

28. Drs. Mitchell and Wolfson observed that Mr. Hammer explained he does not have a death wish and his decision to proceed without counsel is not a suicidal act because if he wanted to die, he could have just hung himself in his cell.

29. Drs. Mitchell and Wolfson agreed that Mr. Hammer is willing to accept the consequences of killing Mr. Marti.

30. Drs. Mitchell and Wolfson agreed that Mr. Hammer wishes to be sentenced and executed immediately so as to end the suffering of incarceration and "move on to something better."

31. Drs. Mitchell and Wolfson agreed that Mr. Hammer "believes there's something better than this."

32. Drs. Mitchell and Wolfson agreed that Mr. Hammer acknowledged to them that he has made impulsive decisions in the past, but that his current decision is well thought out, carefully considered, and reaches a reasonable conclusion under the circumstances of his situation.

33. Drs. Mitchell and Wolfson agreed that Mr. Hammer expressed understanding that filing his motion could lead to his speedier death.

34. Drs. Mitchell and Wolfson agreed that Mr. Hammer conveyed his feelings and thoughts about his decision with clarity, commitment, and conviction.

35. Drs. Mitchell and Wolfson agreed that Mr. Hammer did not display signs of any mental illness which was interfering with his ability to make his decision logically and coherently.

36. Drs. Mitchell and Wolfson agreed that Mr. Hammer was found to be free of any mental illness which would interfere with his ability to think rationally and with sound mind about his decision to file his motion to discharge counsel and proceed pro se.

37. Drs. Mitchell and Wolfson agreed that Mr. Hammer clearly understood the nature of the motion he filed, the potential consequences of his motion, and was able to assist in the processes involved with his motion. (U)

38. Although Dr. Mitchell previously testified that Mr. Hammer in his opinion is suffering from a major depressive disorder, recurrent, that he nonetheless finds Mr. Hammer to be fully competent in deciding to discharge his counsel. (U)

39. On or about August 10, 1998, Stephen C. Smith, Esquire, was appointed as additional counsel for Mr. Hammer. (U)

40. That subsequent to said appointment, Mr. Hammer has presented himself in his verbal communications, his written motions, and various correspondence, that he desires to discharge attorneys Travis and Ruhnke. (U)

41. Mr. Hammer has asserted that the decision to discharge counsel is his, and his alone. (U)

42. Mr. Hammer's evaluations by Dr. Wolfson and Dr. Mitchell indicate that Mr. Hammer desires to discharge attorneys Travis and Ruhnke. (U)

43. Mr. Hammer desires to have Stephen C. Smith, Esquire and David A. Ruhnke, Esquire, represent him throughout the duration of all of these proceedings, as co-counsel with Mr. Hammer or as stand-by counsel. (U)

44. Mr. Hammer's present desire to forego an appeal and ask for immediate imposition and the carrying out of the sentence of death is a competent and well-reasoned decision made by him.

45. During the guilty plea proceedings, attorneys Travis and Ruhnke stated that Mr. Hammer's decision to plead guilty was a competent decision. (U)

46. In a prior proceeding, attorneys Travis and Ruhnke filed a petition seeking to withdraw as counsel to Mr. Hammer, citing a conflict of interest. (U)

47. Attorneys Travis and Ruhnke sought a postponement of the briefing schedule relating to the post-trial motions pending the completion of the court-ordered psychiatric evaluation. (U)

48. The request for postponement of the briefing schedule on the post-trial motions was denied by the Court. (U)

49. On the 15th day of September, 1998, the Court entered an Order denying the post-trial motions filed by attorneys Travis and Ruhnke. (U)

50. During the trial of Mr. Hammer, numerous government witnesses testified that Mr. Hammer was a manipulative person. (U)

51. During the underlying trial, numerous government witnesses testified to lies and fabrications of Mr. Hammer. (U)

52. During the underlying trial, the government developed through witnesses the fact that Mr. Hammer had engaged in numerous scams both in and out of custody. (U)

53. During the underlying trial, Dr. Robert Sadoff testified that Mr. Hammer suffered from dissociative identity disorder. (U)

54. Mr. Hammer has asserted to the Court and asserted to Dr. Wolfson that his decision to discharge counsel is his personal decision and has not been affected by any of the alter personalities including Jocko. (U)

55. During the court's colloquy with Mr. Hammer on October 1, 1998, Mr. Hammer was highly articulate and coherent.

56. During that colloquy, Mr. Hammer expressed his position and arguments at least as well, if not better, than some attorneys who appear before this court.

57. During that colloquy Mr. Hammer did not evidence any signs of mental incompetence and expressed a strong desire to discharge counsel and proceed pro se.

58. Mr. Hammer also expressed a strong desire to forego an appeal and have the sentence of death carried out expeditiously.

59. Mr. Hammer's explanation as to his desire to discharge counsel and waive his appeal rights is set forth at length in Dr. Wolfson's report. That report states in pertinent part as follows:

> While some of the interview time spent with Mr. Hammer during this evaluation was spent discussing issues of his medical history, and he also brought me up to date on some aspects of his case and discussed some case law that he felt was important, the bulk of the time was spent discussing Mr. Hammer's bases for making the various decisions he had made about how he wants his case to proceed from this point. As had been the case in previous discussions, he expressed himself in a sophisticated and insightful fashion. While I am skeptical of my ability to articulate his viewpoint any better than he does, I will summarize some of what he told me.
>
> Mr. Hammer took pains to point out that he was not dissatisfied with his lawyers,
>
> > I really and truly believe that I had outstanding legal representation. Everybody worked to try to save my life. I didn't always agree with them, but I wasn't so pig-headed that I didn't listen to them.
>
> He added that both Mr. Travis and Mr. Ruhnke had pointed out to him that there were some legitimate issues to be raised on appeal, and Mr. Hammer agreed, based on his own assessment, that such issues were present, "My decision is made with full knowledge that there might be some relief if I chose to pursue [post-verdict motions or subsequent appeal]." However, he pointed out that the ultimate outcome, should such appeals be successful, would likely simply be another trial, and that, in terms of sentencing, the best that he could hope for would be a sentence of life without parole, "years and years of incarceration," which he would already be serving in any event, based on his three consecutive 400–year Oklahoma sentences. In light of the fact that this was the best gain that could be produced, Mr. Hammer related

that he found nothing appealing about the prospect of going through a new trial, "For me, this entire process has been one of the most painful experiences of my entire life," particularly in light of the fact that he personally could find little to fault in the trial he had had already, "No trial is ever perfect. I had a fair trial—I had an extremely fair trial." He continued,

> If the case is prolonged, it prolongs the pain and suffering for the defendant and for the victim's family. To accept the verdict of the jury—it allows me to maintain my dignity and prepare for my own death, on my own terms. The harder one fights to live, the more difficult it becomes to accept death when it comes.

Our discussion revisited points Mr. Hammer had made previously about the difference between living a meaningful existence and "merely existing." He again pointed out that he does not fear death, but that if it would be "a new beginning, it's worth looking forward to, and if not, it's still not a loss." He also mentioned that he had not been able to forgive himself for killing Andrew Marti until he made a public acknowledgment of his responsibility, which took a big load off my mind." He also added that there would be "something comforting about knowing the time, place, and method of my death," and he found it ironic that "no one raised this kind of Cain when the jury sentenced me to 1200 years" [in his previous Oklahoma case].

Mr. Hammer also told me, "It's the law that the sentence get carried out. I owe a debt to Andrew Marti and his family." When he said this, I responded to him that it seemed to me that he was articulating a fundamental respect for the law, which certainly was inconsistent with his attitude when younger, at least as expressed by his actions then. To this, he conceded that his viewpoint about the law had indeed changed, "It's just my nature to break the law. As I mature, I try to rein that in and think before I act." He also related that previous offenses had not been on the scale as the offense conduct in this case, "There's a big difference between writing

bogus checks and first degree murder—I accepted the responsibility for the killing of Andrew Marti, knowing full well that the repercussions might include paying with my own life." He related that he had taken plenty of time and reflection before deciding this, and that "I have peace with myself, over my decision."

Though Mr. Hammer related that he agreed with the position expressed in one of the law review articles he provided, which analogizes the acquiescence of a condemned prisoner to a terminally ill individual who has come to terms with his own death, and he acknowledged that having some control over his fate was important to him, he also emphasized that that was not the sole reason he adopted his position, "This is not about control . . . [though] its a factor to have some control over circumstances." He related that another important factor was that, "given that society is going to have a death penalty, I don't believe the death penalty is a deterrent, but if it is ever going to be a deterrent, it has to be carried out in a prompt manner." He continued on that it would be inconsistent for there to be a death penalty imposed and then not subsequently carry it out, "Why in the fuck prolong it?" In further remarks, Mr. Hammer explained that he would find such conduct hypocritical; he appeared to wish to distance himself from such hypocrisy.

Government Exhibit No. 2, Forensic Report prepared by Dr. Wolfson, pp. 13–14.

60. Mr. Hammer's explanation outlined in Dr. Wolfson's report was reiterated in part by Mr. Hammer during the colloquy.

61. Mr. Hammer during the colloquy also expressed a substantial understanding of the legal issues that could be presented to the

Court of Appeals for the Third Circuit if he took an appeal.

62. Mr. Hammer during the colloquy summarized the potential appealable issues as he understood them.

63. Attorneys Travis and Ruhnke supplemented Mr. Hammer's rendition of the appealable issues.

64. The issues outlined by Mr. Hammer without any notes during the colloquy included those raised in the three new trial motions filed by attorneys Travis and Ruhnke that (1) one or more representatives of the United States Marshal's Service provided confidential information to the FBI case agent regarding the identity and location of defense witnesses, (2) the government presented testimony in violation of 18 U.S.C. § 201(c)(2), and (3) there was an inadequate factual basis for his guilty plea.[6]

65. The issues discussed during the colloquy also included challenges to the court's charge to the jury. Specifically, Mr. Hammer noted during the colloquy that he had requested that the jury be instructed that if the jury was unable to reach a unanimous verdict the court would automatically impose a life sentence and that the court denied that request. Attorney Ruhnke also noted during the colloquy that the court denied a request that the jury be instructed that in order to recommend a sentence of death the jury was obliged to find beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances.

66. Mr. Hammer during the colloquy also noted that there was a potential appealable issue relating to our allowance of testimony from David Walter relating to Mr. Hammer's future dangerousness.[7]

67. During the colloquy Attorney Ruhnke also supplemented the issues by stating that

---

6. By order of September 15, 1998, we denied the three new trial motions. (Doc. 618) That order sets forth the basis for denying the motions. The order is attached to this opinion as Appendix A.

7. Mr. Walter was a reporter who interviewed Mr. Hammer regarding his attempted murder of Thomas Upton. Mr. Hammer shot Mr. Upton, who was prone on the ground, three times at close range in the head execution style. Mr.

Upton survived the shooting because the ammunition contained bird shot only. Mr. Hammer told Mr. Walter during the interview that "if he had known his victim lived, he would have reloaded his weapon and fired it six more times." Our amended order of July 23, 1998, sets forth the basis for allowing Mr. Walter to testify. (Doc. 550) That order is attached to this opinion as Appendix B.

there was a potential appealable issue relating to the court's interruption of his closing argument on two occasions.

68. During the colloquy Mr. Hammer was also made aware of potential appealable issues relating to the disposition of pretrial motions [8] and the selection of the jury.[9]

69. Mr. Hammer has previously represented himself in both state and federal court.

70. Mr. Hammer has assisted other inmates with federal appeals.

71. Mr. Hammer has the ability to read and understand the Federal Rules of Appellate Procedure.

72. Mr. Hammer does not suffer from a mental disease or defect which prevents him from understanding the nature and consequences of the proceedings against him or participating in his own defense.

73. Mr. Hammer has the ability to understand the nature and consequences of the proceedings against him and to participate in his own defense.

74. Mr. Hammer's decision to discharge counsel and proceed pro se and his revocable decision to decline to file an appeal within the statutory period are made knowingly, intelligently and voluntarily.

### III. Discussion.

■ Mr. Hammer has the right to self-representation so long as he is competent and his decision to waive counsel and proceed pro se is made knowingly, intelligently and voluntarily. *Godinez v. Moran*, 509 U.S. 389, 396–402, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993); *Faretta v. California*, 422 U.S. 806, 819–21, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). The Supreme Court noted in *Godinez* that

"[t]he focus of the competency inquiry is the defendant's mental capacity; the question is whether he has the ability to understand the proceedings." 509 U.S. at 401 n. 12, 113 S.Ct. 2680. A defendant is competent to waive counsel if he has the capacity to understand the nature and object of the proceedings against him. We are satisfied based on the testimony of Drs. Wolfson and Mitchell, our colloquy with Mr. Hammer on October 1, 1998, and our observations of him during the trial and that colloquy that Mr. Hammer is competent to discharge counsel, proceed pro se and decline to file an appeal within the statutory period.

■ A finding that Mr. Hammer is competent is not, however, the end of the inquiry. Mr. Hammer's decision to waive counsel, proceed pro se, and whether or not to appeal must be made knowingly, intelligently and voluntarily. The "knowingly and intelligently" aspect of the waiver of counsel only requires that the defendant "be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Faretta*, 422 U.S. at 835, 95 S.Ct. 2525 (1975) (citation omitted). "Knowingly and intelligently" should not be confused with "wise." As one court has noted

> The Constitution is a seamless web of rights and liberties—not conferred but guaranteed—against the intrusive, offensive, and sometimes paternalistic presence of Big Government. When a criminal defendant elects to stand at the Bar in his own defense, and he does so knowingly, voluntarily, and unequivocally, the court is bound by the Constitution to honor that

---

8. On August 1, 1997, Mr. Hammer filed twelve pretrial motions. Those motions were disposed of by orders issued on September 18, 19, 25, 26, and 30, and October 7 and 9, 1997. (Docs. 190 through 195, 201 through 203, 206, 210, 211 and 215) Those order are attached to this opinion as Appendix C.

9. During jury selection the court overruled Mr. Hammer's challenges for cause to 21 potential jurors and sustained one challenge for cause made by the government. We issued an order with regard to each potential juror where we overruled a challenge for cause and in the one instance where we sustained the government's challenge. Only three of the potential jurors Mr. Hammer challenged for cause ended up on the final jury that deliberated on his fate: Robert D. Herr, Leslie F. Riggs, and Margaret Ann Meabon. The orders overruling the challenges for cause to those jurors and the order sustaining the government's challenge for cause to, Manga Alagiriswami, the one juror where Mr. Hammer objected to excusal for cause, are attached to this opinion as Appendix D.

election, however suicidal it may appear to be.

*Johnstone v. Kelly*, 633 F.Supp. 1245, 1248 (S.D.N.Y.1986)(Brieant, J.), rev'd on other grounds, 808 F.2d 214 (2d Cir.1986),[10] cert. denied, 482 U.S. 928, 107 S.Ct. 3212, 96 L.Ed.2d 699 (1987). In order for a defendant's waiver of counsel to be voluntary, it must be uncoerced. *Godinez*, 509 U.S. at 401 n. 12, 113 S.Ct. 2680. A defendant should unequivocally request self-representation, rather than claim such a course of conduct has been thrust upon him involuntarily by whatever circumstances. See *United States v. Goldberg*, 67 F.3d 1092, 1099–1100 (3d Cir.1995).

■ Mr. Hammer has requested that counsel be discharged and he be permitted to proceed pro se and decide on his own whether to appeal. His request is unequivocal and made knowingly, intelligently and voluntarily. We will, therefore, discharge attorneys Travis, Ruhnke and Smith as counsel of record for Mr. Hammer. However, attorneys Smith and Ruhnke will be appointed standby counsel.[11]

### IV. Conclusions of Law.

1. The court finds by clear and convincing evidence that Mr. Hammer is competent to discharge attorneys Travis and Ruhnke as his legal representatives, proceed pro se and decide on his own whether to appeal.

2. The court finds by clear and convincing evidence that Mr. Hammer's request to discharge counsel, proceed pro se and decide on his own whether to appeal is made knowingly, intelligently and voluntarily and not as the result of coercion or duress.

### V. Jury Instructions.

We will now address certain issues raised during the trial. At the conclusion of the evidence in the penalty phase of the trial, counsel for Mr. Hammer requested that the jury be instructed on the consequences of a non-unanimous verdict. Specifically, counsel requested that the jury be instructed that if they were unable to reach a unanimous verdict we would automatically impose a sentence of life in prison. Counsel also requested that the jury be instructed that in order for the jury to recommend a sentence of death the jury had to find beyond a reasonable doubt that the aggravating factors outweighed the mitigating factors. We denied both requests.

■ With regard to Mr. Hammer's proposed jury instruction relating to the failure of the jury to reach a unanimous verdict, we will first note that 18 U.S.C. § 3593(e) provides in relevant part that "[b]ased upon this consideration [i.e., weighing of the aggravating and mitigating factors or consideration of the aggravating factors standing alone if there are no mitigating factors found to exist], *the jury by a unanimous vote ... shall recommend whether the defendant shall be sentenced to death, to life imprisonment without possibility of release or some other lesser sentence.*" (Emphasis added.) The prior death penalty statute, 18 U.S.C. § 848(k) was not phrased in such an unequivocal fashion. The former statute provides in relevant part "based upon this consideration, the jury by a unanimous vote ... shall recommend that a sentence of death be imposed *rather than* a sentence of life imprisonment without the possibility of release or some other lesser sentence." (Emphasis added.)

Our denial of Mr. Hammer's proposed jury instruction relating to lack of unanimity was based primarily on the opinion of the Court of Appeals for the Fifth Circuit in *United States v. Jones*, 132 F.3d 232 (5th Cir.1998). Louis Jones was convicted in the United States District Court for the Northern District of Texas of kidnapping with death resulting and was sentenced to death. At the

---

10. Judge Brieant found that a state trial court denied Johnstone his right to waive counsel and proceed pro se. However, Judge Brieant found the error harmless. The Court of Appeals held that harmless error analysis was inapplicable to violations of the right to self-representation and reversed.

11. The United States Supreme Court has stated that a court may "appoint 'standby counsel' to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary." *Faretta v. California*, 422 U.S. 806, 834 n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975)

end of the penalty phase, Jones requested that the district court instruct the jury that failure to reach a unanimous verdict recommending a sentence of death would result in an automatic life sentence without the possibility of release. Specifically, Jones proposed the following two jury instructions apparently in the alternative:

(1) In the event, after due deliberation and reflection, the jury is unable to agree on a unanimous decision as to the sentence to be imposed, you should so advise me and I will impose a sentence of life imprisonment without possibility of release.

(2) If, after fair and impartial consideration of all the evidence in this case, any one of you is not persuaded that justice demands Mr. Jones's execution, then the jury must return a decision against capital punishment and must fix Mr. Jones's punishment at life in prison without the possibility of release.

*Jones,* 132 F.3d at 242 n. 8. The district court denied both requests. The Court of Appeal for Fifth Circuit affirmed the death sentence.

With regard to the refusal of the district court to give Jones's proposed jury instructions, the Court of Appeals for the Fifth Circuit stated:

The actual jury instruction given by the district court repeated the sentencing options available under the [Federal Death Penalty Act]. The instructions traced 18 U.S.C. § 3593(e) by informing the jury that it could recommend death, life without the possibility of release, or some lesser sentence. The defendant, however, contends that the jury should have been instructed that a failure to reach a unanimous verdict recommending the death penalty would result in the court automatically imposing a sentence of life without the possibility of release. The defendant's proposed instructions were not substantively correct because the proposed instructions informed the jury that the failure to return a unanimous verdict would result in an automatic sentence of life without the possibility of release. Such is not the case under § 3593, which requires unanimity for every sentence rendered by the jury regardless whether the verdict is

death, life without the possibility of release, or, if possible under the substantive criminal statute, any other lesser sentence. Life without the possibility of release was not the default penalty in the event of non-unanimity. On the contrary, the failure to reach a unanimous decision regarding sentencing would result in a hung jury with no verdict rendered.

132 F.3d at 242–43.

We find further support for our rejection of Mr. Hammer's proposed instruction in the case of *United States v. Chandler,* 996 F.2d 1073 (11th Cir.1993). The Court of Appeals for the 11th Circuit in *Chandler* interpreted 21 U.S.C. § 848(e), the 1988 death penalty statute enacted by Congress to deal with murders occurring in the setting of a large-scale drug operation to require a district court to impose a life sentence in the event of a non-unanimous jury. However, the Court of Appeals held that "the district court is not required to instruct the jury on the consequences of the jury's inability to reach a unanimous verdict." 996 F.2d at 1089. The Court of Appeals further observed that "[o]ur holding is further supported by the general interest the criminal justice system has in unanimous verdicts. Asking the jury to return a unanimous verdict forces jurors to examine their views on the case and engage in discussions and deliberations as they attempt to resolve their differences." Id.

Our rejection of Mr. Hammer's jury instruction relating to the consequence of the jury failing to reach a unanimous verdict is further supported by the case of *Green v. French,* 143 F.3d 865 (4th Cir.1998). In that case a habeas corpus petitioner asserted that the lack of an instruction to the jury on the consequences of a deadlock could produce coercion. The Court of Appeals for the Fourth Circuit rejected that argument and held that "a court may reasonably refuse to instruct a capital sentencing jury as to the consequences of deadlock in order to promote jury deliberation." Id. at 890.

Although our research has revealed that some state courts—Delaware, New Jersey

and Louisiana [12]—require an instruction similar to that requested by Mr. Hammer, other state courts—North Carolina, Florida and Alabama [13]—do not require such an instruction. However, state law is not controlling. This is federal death penalty case. We are still of the opinion that the plain wording of the statute and the *Jones, Chandler* and *Green* cases strongly support our denial of Hammer's proposed jury instruction relating to the consequences of the jury failing to reach a unanimous verdict.

■ We will now explain why we denied Mr. Hammer's request that the jury be instructed that in order for the jury to recommend a sentence of death the jury had to find beyond a reasonable doubt that the aggravating factors outweighed the mitigating factors. The United States Supreme Court in *Zant v. Stephens*, 462 U.S. 862, 875, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) noted that in *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) the Court approved a "capital sentencing statute even though it clearly did not channel the jury's discretion by enunciating specific standards to guide the jury's consideration of aggravating and mitigating circumstances." In footnote 13 of the *Zant* opinion the Court stated that "specific standards for balancing aggravating against mitigating circumstances are not constitutionally required." In *Franklin v. Lynaugh*, 487 U.S. 164, 179, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988) the Court again noted that "we have never held that a specific method of balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required." As recently as 1994, the Court held that a "capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision." *Tuilaepa v. California*, 512 U.S. 967, 979, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994).

Several Courts of Appeals have considered whether the reasonable doubt standard should be engrained on the weighing process of a capital sentencing scheme. The Court of Appeals for the Ninth Circuit rejected a contention that "the state must prove beyond a reasonable doubt that the death penalty is appropriate." *Harris v. Pulley*, 692 F.2d 1189, 1194 (9th Cir.1982). The Court of Appeals further stated in *Harris:*

> The United States Supreme Court has never stated that a beyond-a-reasonable-doubt standard is required when determining whether a death penalty should be imposed. . . . Moreover, we are not aware of any instance where a state must carry such a burden of proof when attempting to convince a sentencing authority of the appropriate criminal sentence. If the Supreme Court had intended for the burden in death-penalty cases to vary from the standard burden in all other criminal sentencing, it would have said so in one of the many modern cases dealing with the death penalty.

692 F.2d at 1195. The *Harris* decision was overturned by the Supreme Court on other grounds. *Pulley v. Harris*, 465 U.S. 37, 43, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). In reversing *Harris* the Supreme Court noted, without disapproving of, the Court of Appeals' holding that the reasonable doubt standard is not constitutionally required to be engrained on the weighing or balancing process of a capital sentencing scheme. 465 U.S. at 41 n. 4, 104 S.Ct. 871, 79 L.Ed.2d 29.; see also *Gerlaugh v. Lewis*, 898 F.Supp. 1388, 1421 (D.Ariz.1995)(state is not constitutionally required to prove, or sentencing court to find, that aggravating factors outweigh mitigating factors by proof beyond a reasonable doubt), aff'd. 129 F.3d 1027 (9th Cir.1997); *Bonin v. Vasquez*, 807 F.Supp. 589, 620–21 (C.D.Cal.1992)(Constitution does not require jury in penalty phase of capital case to find that aggravating factors outweigh mitigating factors beyond a reasonable doubt), aff'd. 59 F.3d 815 (9th Cir.1995).

The Court of Appeals for the 11th Circuit has also rejected the claim that the reason-

**12.** See *Whalen v. State*, 492 A.2d 552, 562 (Del. 1985); *State v. Ramseur*, 106 N.J. 123, 524 A.2d 188, 283–84 (1987); *State v. Williams*, 392 So.2d 619, 633–34 (La.1980).

**13.** *Barfield v. Harris*, 540 F.Supp. 451, 472 (E.D.N.C.1982); *Aldridge v. State*, 351 So.2d 942, 944 (Fla.1977)(per curiam); *Coulter v. State*, 438 So.2d 336, 346 (Ala.Crim.App.1982)(collecting cases).

able doubt standard should be engrained on the weighing process. *Ford v. Strickland*, 696 F.2d 804 (11th Cir.1983). That Court stated that the petitioner's argument "confuses proof of facts and the weighing of facts in sentencing." 696 F.2d at 818. The Court further explained:

> While the existence of an aggravating or mitigating circumstance is a fact susceptible to proof under a reasonable doubt or preponderance standard, the relative *weight* is not. The process of weighing circumstances is a matter for judge and jury, and unlike facts, is not susceptible to proof by either party. Petitioner's contrary suggestion is based on a misunderstanding of the weighing process, the statute and the guiding and channeling function identified in *Proffitt v. Florida*, 428 U.S. at 258, 96 S.Ct. at 2969. Indeed, it appears no case has applied *In re Winship* in the manner Ford urges. The North Carolina and Utah cases cited by him which imposed a reasonable doubt standard in this situation turned on construction of state statutes rather than the due process rationale of *In re Winship*.

*Id.* The Court of Appeals for the 11th Circuit again addressed the issue in *United States v. Chandler, supra*. The Court of Appeal stated:

> That the jury need only be instructed that the aggravating factors sufficiently outweigh the mitigating factors is entirely appropriate. A capital sentencing scheme is constitutional even if it does not require that a specific burden of proof govern the jury's weighing process.

996 F.2d at 1091. As previously noted *Chandler* involved the 1988 death penalty statute enacted by Congress to deal with murders occurring in the setting of a large-scale drug operation.

The Court of Appeals for the 10th Circuit has also addressed the issue. *Andrews v. Shulsen*, 802 F.2d 1256 (10th Cir.1986). In *Andrews* the Court held that "sentencing authorities may determine a defendant's fate without regard for burdens of proof or other measures of certainty." Id. at 1264. In a well-known case tried in the 10th Circuit, *United States v. McVeigh*, 96–CR–68–M (D.Colo.), the defendant, Timothy James McVeigh, requested a jury instruction similar to that requested by Mr. Hammer. McVeigh requested that the jury be instructed that "[o]nly if you are unanimously persuaded beyond a reasonable doubt that the aggravating factors so outweigh the mitigating factors that justice cannot be done by any sentence less than death can you return a decision in favor of capital punishment." Brief of the United States Regarding Weighing Process and Mitigating Factors filed in the *McVeigh* case, 1997 WL 312093 (D.Colo. Doc.). Judge Richard P. Match did not so instruct the jury. Official Trial Transcript, Closing Arguments and Jury Instructions in the *McVeigh* case, 1997 WL 312609 (D.Colo. Trans.).

Finally, the language of the death penalty statute, 18 U.S.C. § 3593(e), itself gives no indication that a reasonable doubt standard is required. The language of the statute instructs that the capital sentencer need only find that the aggravating factors "sufficiently outweigh" all the mitigating factors. Congress clearly identified the standard to be used in the weighing process, and by so doing excluded other standards, specifically the reasonable doubt standard. This conclusion is further supported by Congress specifically setting forth the reasonable doubt standard in other parts of the statute, e.g., a jury cannot find that an aggravating factor exists unless the jury is convinced beyond a reasonable doubt that the aggravating factor is present. When Congress intended the reasonable doubt standard to be applicable it so specified. See 18 U.S.C. §§ 3591(a)(2) and 3593(c).

## VI. Court's Interruption of Defense Counsel's Closing Argument

█ The government and the defense were each allotted by the court a total of 4½ hours for closing argument. The government's closing was split 3½ hours for initial argument and 1 hour for rebuttal. On July 21, 1998, at 10:00 a.m. the court charged the jury regarding the legal principles which apply to the case. At the conclusion of the charge the government commenced its initial closing argument which was completed at approximately 4:20 p.m. At that time attor-

ney Ruhnke requested that he have five minutes with the jury "so Mr. Martin is not the only one to have spoken to them today . . . ." The court permitted attorney Ruhnke to commence his closing argument. What transpired after Mr. Ruhnke commenced his closing argument is as follows:

MR. RUHNKE: I will only take five minutes of your time today, but I wanted to talk to you before you leave for the night, because you've just heard a representative of your government, my government, spend the better part of a day advocating for the death of a human being. I mean that is what this is about, and that is what you have heard today.

You've heard a representative of your government take the boundaries of responsible advocacy, that is argument—

THE COURT REPORTER: I'm sorry, could you speak up.

THE COURT: Yeah, I couldn't hear the last phrase either.

MR. RUHNKE: To take the boundaries of responsible advocacy and stretch them to their absolute limit in order to try to convince you to sentence another human being to death.

THE COURT: May I see counsel?

(Whereupon, the following occurred at sidebar between the Court and counsel.) THE COURT: I think that is grossly improper argument. I have never heard anything like it before.

MR. RUHNKE: I didn't say exceeded the limits, Your Honor, I said stretched the limits to the outer boundaries—

THE COURT: I said I think it's extremely bad and we're going to give you four more minutes but I don't want to hear any more like that.

MR. RUHNKE: I think it's fair comment. THE COURT: I am directing you to go forward. If you don't, we're going to send this jury home.

(Whereupon, the discussion held at sidebar between the Court and counsel concluded.)

MR RUHNKE: When a jury hears the kinds of arguments that it's heard today, it's possible to begin to hate another human being, it's possible to begin to hate Mr. Hammer.

THE COURT: May I see counsel?

(Whereupon, the following occurred at sidebar between the Court and counsel.) THE COURT: Now, we are not going to permit this kind of argument in this Court. I never heard anything like it. I am going to send this jury home and I don't want any more of it tomorrow. And if I hear more of it tomorrow I'm going to cut you off.

Do you understand that?

MR. RUHNKE: Your Honor, I understand you very well.

THE COURT: All right, that's the end of it. Take your seat.

(Whereupon, the discussion held at sidebar between the Court and counsel was concluded.)

After the conference at sidebar was concluded, the jury was given certain instructions, including an instruction not to discuss the case, and excused for the day. Attorney Ruhnke then requested that the court grant a mistrial because of the interruption of his closing. The request was denied.

■ The court's comments in the instant case were conveyed to attorney Ruhnke out of the hearing of the jury. The court interrupted attorney Ruhnke to limit him to remarks that could fairly be considered supported by the evidence. At no point during the government's closing was it suggested by government counsel that the jurors should be governed by hate or that they should hate Mr. Hammer. On July 21, 1998, when we interrupted attorney Ruhnke's closing argument we were of the opinion that he was attempting to prejudice the jury by a claim of an overreaching prosecution. The closing by government counsel was entirely proper and in no way even approached taking the boundaries of responsible advocacy and stretching them to their absolute limit. Attorney Ruhnke was contending that the government went beyond the boundaries of proper argument. The boundaries of proper argument are set and cannot be stretched. An attorney either remains within the boundaries of proper argument or goes outside of

them. The statements of attorney Ruhnke were not proper comment on the evidence presented during the trial. Furthermore, they were in the view of the undersigned an inappropriate attack on opposing counsel.

On July 22, 1998, attorney Ruhnke commenced his closing argument at 10:00 a.m. Attorney Travis concluded the closing argument for the defense at approximately 10:20 a.m. on July 23, 1998, at which time the government presented rebuttal argument.

On July 23, 1998, it was brought to the court's attention that the jury may have overheard what was said at sidebar on that day. The secrecy of sidebar conferences in this court is always preserved by a noisemaker activated by the court reporter. The court inquired of the jury if they had overheard anything that was discussed at sidebar that day, on July 22 or on July 21, 1998.[14] None of the jurors answered in the affirmative.

 Statements made during closing argument must be supported by the record and a trial judge has broad discretion to control the scope and content of closing argument. *United States v. Pool,* 660 F.2d 547, 561 (5th Cir.1981). If comments are made by counsel during closing argument that are not supported by the record, the trial judge is permitted to interrupt counsel. *Id.*; see also *United States v. Jimenez–Diaz,* 659 F.2d 562, 569 (5th Cir.1981)("When counsel voiced his personal opinion about agent's conduct, the court simply cautioned him, quite appropriately, to confine his argument to conclusions he wished the jury to draw from the evidence."). Only in rare circumstances will the court's interruptions of a defense counsel's closing argument call for a new trial. See *United States v. Moreno–Pulido,* 695 F.2d 1141, 1146 (9th Cir.1983); see also *United States v. Busic,* 592 F.2d 13, 28–29 (2d 1978)(even where the court interrupted the

closing argument of defense counsel 44 times a new trial was not granted).

The Court of Appeals for the Ninth Circuit has held that a new trial is only warranted when the record reveals actual bias on the part of the trial judge or an appearance of advocacy or partiality is projected to the jury. *United States v. Mostella,* 802 F.2d 358, 361 (9th Cir.1986). Likewise, the Court of Appeals for the Seventh Circuit stated "that to warrant reversal because of a trial judge's comments during defense counsel's closing argument, 'it must appear that the conduct [of the trial judge] measured by the facts of the case presented together with the result of the trial, was clearly prejudicial to the rights of the party.'" *United States v. Briggs,* 700 F.2d 408, 414 (7th Cir.1983)(quoting *United States v. Eldred,* 588 F.2d 746, 750 (9th Cir.1978)). The Court of Appeals for the Seventh Circuit further observed that a judge has the right and often the obligation to interrupt closing argument in order to insure a fair trial. *Briggs,* 700 F.2d at 414. That is exactly what was done here.

In the *Briggs* case defense counsel made a statement "that it was a 'crime' that [his client the codefendant to Briggs] should be charged with the offenses in the indictment." *Id* at 415. The Court of Appeals observed that that statement "if not actually going beyond the range of proper argument, it certainly borders on the same." *Id.* The Court of Appeals than held that "[i]n the trial of a lawsuit where defense counsel makes improper suggestions to the jury and his statements go beyond the range of what a judge determines is proper ... it is well within the discretion of the trial judge to advise and caution defense counsel during the argument, as to the appropriateness of his remarks." *Id.* at 415. The Court of Appeals further held that "even if it had been error for the trial judge to interrupt ... counsel during closing argument ... before

---

**14.** The transcript states as follows:
THE COURT: There has been some question as to whether the jury is able to hear what we say at the sidebar conference today or, let's say two days ago. Did you hear anything?
JURY PANEL: No.
THE COURT: Well, I'll put it another way. Did any juror hear anything said at the sidebar

conference today, yesterday, or the day before; if so, please put up your hand and we'll inquire.
All right. I don't see any hands raised.
Is that acceptable to the defense?
MR. RUHNKE: Yes, Your Honor.
THE COURT: All right. You may go ahead, sir.

conduct of the trial judge rises to the level of reversible error, the defendant must demonstrate that the judge's conduct was prejudicial and substantially interfered with the defendant's rights." *Id.*

As noted, our remarks to attorney Ruhnke were made out of the hearing of the jury. Furthermore, defense counsel were given 4 ½ hours for closing argument. The court did not interrupt that 4½ hours other than for needed recesses for the jury. Moreover, at the conclusion of closing argument and before the jury was sent out to deliberate, the court instructed the jury as follows:

> Before you retire to the jury room to deliberate, I want to reemphasize a few final cautionary instructions in this extremely serious case. You are to perform your duty as jurors without bias or prejudice as to either party. The law does not permit jurors to be governed by fear, favor, emotion, prejudice, or public opinion. Mr. Hammer, the government and the public expect that you will carefully and impartially consider all the evidence in the case, follow the law as stated by the court and reach a true and just decision.
>
> Anything that I may have said or done during the trial should not be taken as an indication that I have an opinion regarding how you should answer or complete the Special Findings form. That is your sole and exclusive responsibility. I in fact have no such opinion. I have carefully refrained from forming any such opinion. You are to follow scrupulously the court's instructions which were read to you. You will each have a copy of the instructions in typewritten form during your deliberations.
>
> In order that your findings are complete and consistent with each other, it is extremely important with respect to any question on the Special Findings form that you carefully follow the instructions relating to that question.

Consequently, we are satisfied that the court's two interruptions of attorney Ruhnke's closing argument on July 21, 1998, were completely proper and totally irrelevant to the outcome of the case. The denial of the motion for a mistrial based on the court's interruption of Mr. Ruhnke's closing was justified. The motion was completely devoid of merit.

## APPENDIX A

### IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.

DAVID PAUL HAMMER

No. 4:CR–96–239

(Judge Muir)

*ORDER*

September 15, 1998.

THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

On July 24, 1998, a jury recommended that David Paul Hammer be sentenced to death. On August 3, 1998, Hammer filed three motions for a new trial. The motions are fully briefed and ripe for disposition.

Fed.R.Crim.P. 33 states in pertinent part: "The court on motion of a defendant may grant a new trial to that defendant if required in the interest of justice." A defendant bears the burden of persuading the trial court that the interest of justice requires the grant of a new trial. *United States v. Geders*, 625 F.2d 31, 33 (5th Cir.1980). The decision to grant or deny a motion for a new trial lies within the discretion of the trial court. *United States v. Anderson*, 76 F.3d 685 (6th Cir.1996).

In the first motion Hammer claims that one or more representatives of the United States Marshal's Service provided confidential information to the FBI case agent regarding the identity and location of defense witnesses. Defense counsel filed ex parte and under seal applications for writs of habeas corpus ad testificandum. Defense counsel also provided the court with proposed writs of habeas corpus ad testificandum (Docs. 376 through 385). The court signed those proposed writs and the Clerk's Office delivered them to the United States Marshal's Service.

Those writs did not state that the writs were filed under seal or instruct the United States Deputy Marshals to keep the contents of the writs confidential. The Clerk's Office only delivered copies of the writs to the United States Marshal's Service and did not provide the United States Marshal's Service with copies of the applications for the writs. Consequently, there is no basis for a claim that any Deputy United States Marshals violated a requirement that the contents of the writs be kept confidential. Moreover, assuming that the Deputy United States Marshals had notice of their obligation to keep the contents of the writs confidential, the remedy is not the grant of new trial because there has been no showing of prejudice resulting from any alleged disclosure. Cf. *United States v. Starusko,* 729 F.2d 256, 264 (3d Cir.1984). A new trial is not required in the interest of justice based on Hammer's claim that one or more representatives of the United States Marshal's Service provided confidential information to the FBI case agent regarding the identity and location of defense witnesses.

In the second motion for a new trial Hammer claims that the prosecution presented testimony in violation of 18 U.S.C. § 201(c)(2). That provision provides that

(c) Whoever—

\* \* \* \* \* \*

(2) directly or indirectly, gives, offers or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given or to be given by such person as a witness upon a trial, hearing, or other proceeding, before any court, any committee of either House or both Houses of Congress, or any agency, commission, or officer authorized by the laws of the United States to hear evidence or take testimony, or for or because of such person's absence therefrom;

\* \* \* \* \* \*

shall be fined under this title or imprisoned for not more than two years, or both. During the guilt phase of the trial, the government called as witnesses two federal inmates, Steven Classen and Leonard Yager. Hammer contends that the government by

making certain promises to inmates Classen and Yager in exchange for their testimony provided unlawful gratuities to them in violation of § 201(c)(2). The prosecution does not dispute the essential factual basis surrounding Hammer's claim. Both inmates testified with the understanding that their cooperation could result in transfers to safer and lower security prisons as well as reduction in their sentences, if found to be appropriate by the United States Attorney's Office which prosecuted them and their sentencing judges.

Hammer relies on a recent opinion issued by the Court of Appeals for the Tenth Circuit. See *United States v. Singleton,* 144 F.3d 1343 (10th Cir.1998). However, that opinion was vacated and rehearing en banc was ordered by the Court of Appeals. Furthermore, the opinion has been criticized and disapproved of by several district courts. See, e.g., *United States v. Arana,* 18 F.Supp.2d 715, 1998 WL 420673 (E.D.Mich. 1998).

The *Singleton* panel's conclusion that prosecutors commit a federal criminal offense when they engage in the common practice of offering lenity for a witness' truthful testimony was an extreme and radical departure from history, practice, and established law. Not only did the panel make a criminal out of nearly every federal prosecutor—and accomplices out of district judges—it suppresses highly relevant evidence and cripples enforcement of federal criminal law. Congress did not intend that result. In 1962 when revising § 201 into its current form, Congress made bribing a witness a separate offense, but gave no indication it intended to include under the new gratuity statute prosecutors who engage in the then common practice of offering leniency to cooperating witnesses. Instead, the legislative history of this revision states it "would make no significant changes of substance." S.Rep. No. 2213, 87th Cong., 2d Sess. (1962), *reprinted in* 1962 U.S.C.C.A.N. 3852, 3853.

In the matter of *United States v. Birchfield, et al.,* 4:CR–97–0195, Judge McClure of this court on August 11, 1998, denied a similar motion, relying on the reasoning of Judge Rosen of the United States District Court for the Eastern District of Michigan in his opin-

ion in *United States v. Arana.* Judge Rosen sets forth a thorough analysis and concludes that the three judge panel of the Court of Appeals for the Tenth Circuit in *Singleton* made an erroneous decision. We concur with the reasoning and analysis of Judge Rosen. See also *United States v. Reid,* 19 F.Supp.2d 534, 537, 1998 WL 481459 (E.D.Va.1998)(Spencer, J)("This court holds that a reading of Section 201(c)(2) that includes government attorneys would work 'obvious absurdity' and, ... 'the general words of a statute do not include the government or affect its rights unless the construction be clear and indisputable upon the text of the act.'"); *United States v. Guillaume,* 13 F.Supp.2d 1331, 1333, 1998 WL 462199 (S.D.Fla.1998)(Moreno, J.)("The recommendation of leniency in exchange for testimony is a recognized and established activity of federal prosecutors in the investigation and prosecution of criminal activity."); *United States v. Barbaro,* 1998 WL 556152 (S.D.N.Y., Sept.1, 1998)(Keenan, J.)("The concept of affording cooperating accomplices leniency dates back to the common law of England and has been recognized and approved by the United States Congress, the United States Courts and the United States Sentencing Commission."); *United States v. Eisenhardt,* 10 F.Supp.2d 521, 1998 WL 436356 (D.Md.,1998)(Smalkin, J.)("The Court, first, notes that the panel opinion in *Singleton* has been vacated. Thus, it is no longer of any authoritative weight at all. Furthermore, it never was, in my judgment, persuasive authority. Before it was vacated, the undersigned read that opinion, and ... concluded that it was amazingly unsound, not to mention nonsensical, ... The chances of either or both the Fourth Circuit and the Supreme Court reaching the same conclusion as the *Singleton* panel are, in this Court's judgment, about the same as discovering that the entire roster of the Baltimore Orioles consists of cleverly disguised leprechauns."). The motion for a new trial based on the *Singleton* opinion is devoid of merit and will be denied.

In the third motion for a new trial, Hammer claims that there was an inadequate factual basis for his guilty plea. This claim is devoid of any merit whatsoever. On June 22, 1998, we engaged in an extensive and thorough colloquy with Hammer. Hammer admitted twice that he had committed the act as charged in the remaining count of the indictment. He agreed substantially with the prosecution's view of the evidence. In addition, when asked whether he acknowledged his guilt "of the crime charged in the remaining count of th[e] indictment," Hammer responded, "Yes, sir, I do." There were two different sources of information available to the court at the time of the entry of Hammer's guilty plea. This information included the approximately three weeks of testimony which began on June 2, 1998. Indeed, the prosecutor alluded to that fact by stated that "since the Court has heard the evidence over the past several weeks, I'll give a thumbnail rendition of that evidence." We also heard Hammer admit that he was guilty of the offense after being advised of all of the elements of the offense. Thus, whether one relies upon the evidence presented to the court prior to June 22, 1998 and during the guilty plea colloquy, or reviews exclusively Hammer's statements on June 22, 1998, the result is the same. That is, there exists a factual basis for the guilty plea. Finally, at the conclusion of the guilty plea colloquy we stated as follows:

> I find the defendant is acting voluntarily and not as a result of force or threats or promises. Secondly, that he fully understands his rights, fully understands the consequences of his plea of guilty, voluntarily waives his right to a trial on the guilt phase, and is in fact guilty.

We further found that the plea was "knowledgeable, voluntary and has a basis [in] fact which contains all the elements of the crime charged ...." Hammer's third new trial motion will be denied.

NOW, THEREFORE, IT IS ORDERED THAT:

1. Hammer's motion for a new trial based on a claim that one or more representatives of the United States Marshal's Service provided confidential information to the FBI case agent regarding the identity and location of defense witnesses (Doc. 579) is denied.

2. Hammer's motion for a new trial based on the claim that testimony was presented in violation of 18 U.S.C. § 201(c)(2) (Doc. 582) is denied.

3. Hammer's motion for a new trial based on the claim that there was an inadequate factual basis for Hammer's guilty plea (Doc. 580) is denied.

## APPENDIX B

### AMENDED ORDER

July 23, 1998.

THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

On June 29, 1998, Hammer filed a document entitled "Request by Counsel to Confer with the Court and Government Counsel Prior to Commencement of Penalty Phase." In that document Hammer, inter alia, claims that our order of September 30, 1997, precluded the testimony of David Walter. On June 30, 1998, we orally denied Hammer's request to exclude the testimony of Mr. Walter. Although our order of September 30, 1997, struck from the notice what was referred to as "additional, uncharged" or "other serious acts of violence" it did not strike from the notice or preclude the government from using evidence of Hammer's alleged lack of remorse or boastful statements to the extent that the evidence is indicative of future dangerousness. The order of September 30, 1997, at page 6 specifically stated "[w]e will ... deny Hammer's motion to strike the portions of the notice referring to his lack of remorse and boastful statements." The portion of the notice referring to Hammer's statement that "if he had known his victim lived, he would have reloaded his weapon and fired it six more times" was not stricken from the notice. That was a boastful statement indicative of future dangerousness. The purpose of this order is to reduce to writing our oral order denying Hammer's request to exclude the testimony of Mr. Walter.

Defense counsel on July 1, 1998, stated that we had authorized an amendment to the government's notice by our order from the bench of June 30, 1998. Such is not the case. The oral order contained no authorization for the government to amend its notice. No amendment was required.

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

Hammer's motion to exclude the testimony of Mr. Walter is denied.

## APPENDIX C

### ORDER

September 18, 1997.

THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

On September 18, 1996, a Grand Jury sitting in Williamsport, Pennsylvania returned an indictment charging Defendant David Paul Hammer with first degree murder. On April 9, 1997, the government filed a notice of its intent to seek the death penalty in this case. This case is on the January, 1998, trial list. On August 1, 1997, Hammer filed twelve pretrial motions. Those motions are fully briefed and are ripe for disposition.

This order addresses Motion No. 1 filed on August 1, 1997, in which Hammer requests that we declare the Federal Death Penalty Act of 1994 unconstitutional. Hammer argues that the death penalty is cruel and unusual punishment and inherently racist, results in executing the innocent, vests prosecutors with undue discretion, and will be repudiated by the public in the future. The United States Supreme Court has considered and rejected all of these arguments. See, e.g., *McCleskey v. Kemp*, 481 U.S. 279, 296–97, 300–01, 306–07, 307 n. 28, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987); *Gregg v. Georgia*, 428 U.S. 153, 177–78, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)(opinion of Stewart, Powell, and Stevens,JJ.)(citing two centuries of precedent recognizing that capital punishment is not invalid per se).

Hammer's citation to the farewell dissenting opinion of Justice Blackmun in *Callins v. Collins*, 510 U.S. 1141, 114 S.Ct. 1127, 1128, 127 L.Ed.2d 435 (1994) and the dissenting opinion of Judge Lewis, joined by Judges Mansmann and McKee, in *Flamer v. Delaware*, 68 F.3d 736, 764–76 (3d Cir.1995) pro-

vides no basis for this court to find that the federal death penalty is unconstitutional. Relying on controlling Supreme Court precedent, including *McCleskey v. Kemp* and *Gregg v. Georgia*, we will reject the challenge.

ACCORDINGLY, IT IS HEREBY ORDERED THAT:

Hammer's Motion to Declare the Federal Death Penalty Act of 1994 Unconstitutional (Motion No. 1 filed August 1, 1997, Doc. 148) is denied.

*ORDER # 1 of*

September 19, 1997.

THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

On September 18, 1996, a Grand Jury sitting in Williamsport, Pennsylvania returned an indictment charging Defendant David Paul Hammer with first degree murder. On April 9, 1997, the government filed a notice of its intent to seek the death penalty in this case. This case is on the January, 1998, trial list. On August 1, 1997, Hammer filed twelve pretrial motions. Those motions are fully briefed and are ripe for disposition.

This order addresses Motion No. 2 filed on August 1, 1997, in which Hammer requests that we dismiss the government's notice of its intent to seek the death penalty on the ground that the "intent" factors do not constitutionally narrow the class of offenders exposed to the death penalty.

The Supreme Court considered and rejected virtually the same argument in *Lowenfield v. Phelps*, 484 U.S. 231, 233–34, 241–46, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), where the only aggravating factor found by the jury on sentencing was identical to the intent element of the capital offense of which the defendant was convicted. The Supreme Court concluded that the crime, as defined by the legislature, genuinely narrowed the class of defendants eligible for the death penalty at the guilt phase, and thus, the court held that duplication of the intent elements at the penalty phase did not violate the Constitution. *Id.* In this case 18 U.S.C.

§ 3592, the provision setting forth the aggravating and mitigating factors to be considered by the jury at the penalty phase, genuinely narrows the class of defendants eligible for the death penalty. We will, therefore, deny Hammer's Motion No. 2 filed on August 1, 1997.

There are two other issues presented by Hammer's Motion No. 2. Although neither issue affects the validity of the government's notice of intent to seek the death penalty, the issues will be addressed. First, Hammer argues that the government must prior to trial elect between the intent elements set forth in 18 U.S.C. § 3591(a)(2). 18 U.S.C. § 3591(a)(2) provides:

(a) A defendant who has been found guilty of—

 \* \* \* \* \* \*

(2) any other offense for which a sentence of death is provided, if the defendant, as determined beyond a reasonable doubt at the [penalty phase] hearing under section 3593—

(A) intentionally killed the victim;

(B) intentionally inflicted serious bodily injury that resulted in the death of the victim;

(C) intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim dies as a direct result of the act; or

(D) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act,

shall be sentenced to death if, after consideration of the factors set forth in section 3592 in the course of a hearing held pursuant to section 3593, it is determined that imposition of a sentence of death is justified, . . . .

Hammer offers no authority for his proposition that the government is obliged to elect between the intent elements set forth in § 3591(a)(2) and we find nothing in the statute that would require the government so to elect. Furthermore, it is not obvious to us, as it apparently is to Hammer, that the government will have so to elect at the time of trial. Cf. *United States v. Flores*, 63 F.3d 1342, 1367 (5th Cir.1995)(jury was asked to decide whether the government established at least one of the four intent factors). We are not precluding Hammer from raising the issue during the course of trial. However, Hammer should present clear authority requiring the government to elect one of the intent factors set forth in § 3591(a)(2).

The second issue raised by Hammer's Motion No. 2 which does not affect the validity of the government's notice of intent to seek the death penalty relates to what aggravating and mitigating factors can be weighed by the jury during the penalty phase. It appears that there is a dispute as to whether the "intent" factors set forth in § 3591(a)(2) can be considered by the jury during the penalty phase as aggravating factors that should be weighed against any mitigating factors. This is a matter that need not be decided prior to trial. However, the court is dubious whether the "intent" factors set forth in § 3591(a)(2) can be considered aggravating factors. The aggravating and mitigating factors are set forth in 18 U.S.C. § 3592 and the procedures spelled out in § 3593 relating to the penalty phase hearing refer to the balancing or weighing of the aggravating and mitigating factors set forth in § 3592. Cf. *United States v. Nguyen*, 928 F.Supp. 1525, 1532–33 (D.Kan.1996)(a case where the defendant was charged with the death-eligible offense of murder by use of a firearm during the course of a robbery, the government noted that the use of a firearm was not a statutory aggravating factor and that the jury during the death penalty phase of the trial must find the presence of at least one of the statutory aggravating factors set forth in 18 U.S.C. § 3592(c)).

ACCORDINGLY, IT IS HEREBY ORDERED THAT:

Hammer's Motion to Dismiss the Death–Notice (Motion No. 2 filed August 1, 1997, Doc. 134) is denied.

*ORDER # 2 of*
September 19, 1997.

THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

On September 18, 1996, a Grand Jury sitting in Williamsport, Pennsylvania returned an indictment charging Defendant David Paul Hammer with first degree murder. On April 9, 1997, the government filed a notice of its intent to seek the death penalty in this case. This case is on the January, 1998, trial list. On August 1, 1997, Hammer filed twelve pretrial motions. Those motions are fully briefed and are ripe for disposition.

This order addresses Motion No. 3 filed on August 1, 1997, in which Hammer requests that one of the aggravating factors, i.e., a December 4, 1978, Caddo County, Oklahoma, conviction for robbery with a dangerous weapon, set forth in Section B, ¶ 1, of the government's notice to seek the death penalty should be stricken from the notice. Section B, ¶ 1 of the government's notice sets forth aggravating factors under 18 U.S.C. § 3592(c)(2). Section 3592(c)(2) provides that a prior conviction of "a Federal or State offense punishable by a term of imprisonment of more than 1 year, involving the use or attempted or threatened use of a firearm (as defined in section 921) against another person" is an aggravating factor that the jury can consider during the death penalty phase of the trial.

In Section B, ¶ 1, of the government's notice of intent to seek the death penalty, the government lists three convictions. Hammer claims that the 1978 Caddo County conviction for robbery involved the use of a knife and not a firearm. The government states that Hammer's "claim has technical merit" and agrees that reference to the 1978 Caddo County conviction should be stricken as a statutory aggravating factor from Section B, ¶ 1, of the government's notice of intent to seek the death penalty.

ACCORDINGLY, IT IS HEREBY ORDERED THAT:

Hammer's motion to strike the Caddo County robbery conviction from Section B, ¶ 1, of the government's notice of intent to seek the death penalty (Motion No. 3 filed August 1, 1997, Doc. 136) is granted.

## ORDER # 3 of
### September 19, 1997.

THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

On September 18, 1996, a Grand Jury sitting in Williamsport, Pennsylvania returned an indictment charging Defendant David Paul Hammer with first degree murder. On April 9, 1997, the government filed a notice of its intent to seek the death penalty in this case. This case is on the January, 1998, trial list. On August 1, 1997, Hammer filed twelve pretrial motions. Those motions are fully briefed and are ripe for disposition.

This order addresses Motion No. 4 filed on August 1, 1997, in which Hammer requests that the aggravating factor of two state court convictions involving the infliction of, or attempted infliction of, serious bodily injury or death set forth in Section B, ¶ 2, of the government's notice to seek the death penalty be stricken from the notice.

Section B, ¶ 2, of the government's notice sets forth an aggravating factor under 18 U.S.C. § 3592(c)(4). Section 3592(c)(4) provides that two or more prior convictions of "Federal or State offenses, punishable by a term of imprisonment of more than 1 year, committed on different occasions, involving the infliction of, or attempted infliction of, serious bodily injury or death upon another person" is an aggravating factor that the jury can consider during the death penalty phase of the trial.

In Section B, ¶ 2, of the government's notice of intent to seek the death penalty, the government lists the following two state court convictions: (1) a 1982 conviction in Cleveland County, Oklahoma, for robbery by fear, and (2) a 1984 conviction in Oklahoma County, Oklahoma, for robbery with a firearm and shooting with intent to kill. Hammer claims that the 1982 Cleveland County conviction for robbery did not involve the

infliction of, or attempted infliction of, serious bodily injury or death upon another person.

The government does not dispute the rendition of the facts surrounding the 1982 Cleveland County conviction set forth in Hammer's brief in support of the motion. That rendition reveals that Hammer on or about October 25, 1981, while on escape status from an Oklahoma correctional institution, entered the home of Lonnie and Effie Huddleston, husband and wife, in Norman, Oklahoma. While Hammer was in the Huddleston's home, he threatened each of them with a poker from the couple's fireplace. However, there is nothing in the court records to suggest that Hammer inflicted or attempted to inflict serious bodily injury or death upon the Huddlestons.

ACCORDINGLY, IT IS HEREBY ORDERED THAT:

Hammer's motion to strike the statutory aggravating factor set forth in Section B, ¶ 2, of the government's notice of intent to seek the death penalty (Motion No. 4 filed August 1, 1997, Doc. 138) is granted.

## ORDER # 4 of
### September 19, 1997.

THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

On September 18, 1996, a Grand Jury sitting in Williamsport, Pennsylvania returned an indictment charging Defendant David Paul Hammer with first degree murder. On April 9, 1997, the government filed a notice of its intent to seek the death penalty in this case. This case is on the January, 1998, trial list. On August 1, 1997, Hammer filed twelve pretrial motions. Those motions are fully briefed and are ripe for disposition.

This order addresses Motion No. 5 filed on August 1, 1997, in which Hammer requests that the statutory aggravating factor that the murder was committed "in an especially heinous, cruel or depraved manner" set forth at § B, ¶ 3, of the government's notice to seek the death penalty should be stricken from the notice. Section B, ¶ 3, of the government's notice sets forth an aggravating factor pursuant 18 U.S.C. § 3592(c)(6). Section 3592(c)(6) provides that committing an "of-

fense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim" is an aggravating factor that the jury can consider during the death penalty phase of the trial.

Hammer claims that this aggravating factor is unconstitutionally vague and overbroad. This argument has been rejected by the Supreme Court in *Walton v. Arizona*, 497 U.S. 639, 654–55, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990). In that case the aggravating factor was the commission of the murder in an "especially heinous, cruel or depraved" manner. The Supreme Court expressed approval of jury instructions that elaborate on those terms. Id. at 653, 110 S.Ct. 3047; see also *Proffitt v. Florida*, 428 U.S. 242, 255–56, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976)("especially heinous, atrocious, or cruel" language is not unconstitutionally vague when limited to a "conscienceless or pitiless crime which is unnecessarily torturous to the victim").

A more recent decision of the Supreme Court explains that a statutory aggravating factor is not unconstitutionally vague if it meets either of two different tests: (1) the statutory language itself is sufficiently clear and specific to provide guidance, or (2) the narrowing construction by courts has adequately defined otherwise vague statutory terms. *Arave v. Creech*, 507 U.S. 463, 469–73, 113 S.Ct. 1534, 1540–41, 123 L.Ed.2d 188 (1993). The Court went on to hold that it was not necessary to decide whether the statutory phrase "utter disregard for human life" was too vague because the state court had adopted a limiting construction of the phrase which met constitutional requirements. *Id.* at 471–73, 113 S.Ct. at 1541. In the present case, the statutory language of section 3592(c)(6) already includes the limiting language, i.e., "some kind of torture or physical abuse," approved by the Supreme Court in *Walton v. Arizona*. See also *United States v. Nguyen*, 928 F.Supp. 1525, 1534–35 (D.Kan.1996)(Belot, J.)(statutory aggravating factor under federal death penalty statute that defendant committed offense in especially heinous, cruel or depraved manner, involving torture or serious physical abuse to

the victim was not unconstitutionally vague); *United States v. Bradley*, 880 F.Supp. 271, 289 (M.D.Pa.1994)(Rambo, J.)(same). Therefore, it is not necessary for the court to limit the language any further in order to meet the requirements of the Constitution.

Hammer also claims that the aggravating factor, i.e., he committed the offense in an especially, heinous, cruel or depraved manner, involving torture or serious physical abuse to the victim, is unconstitutional as applied to him. The government has indicated that the evidence will show that Hammer, rather than confront the victim directly to kill him, succeeded in convincing the victim to have each limb bound "by using the ruse that he would thereby merely injure him and obtain a transfer for them to another prison." Furthermore, during the course of rendering the victim unconscious with a "sleeper hold", the victim pleaded for his life and told Hammer that his behavior caused him to have flashbacks to when he previously had been shot in the head. Also, when the victim began to whimper, Hammer increased his activities. The autopsy report apparently reveals that the victim struggled in the restraints which is consistent with Hammer's statement to agents of the Federal Bureau of Investigation about the victim's response to Hammer's actions. During the course of rendering the victim unconscious, Hammer's "shoulder popped out" of its socket as the result of the pressure he was applying to the victim's neck. As a result of the dislocated shoulder, Hammer stopped strangling the victim for a period of time to "get the shoulder back into its socket." Once he adjusted his shoulder, Hammer continued to apply a "sleeper hold" to the victim. After the victim was render unconscious with the "sleeper hold," the victim was strangled with a cloth cord or homemade garrote. Based on the foregoing proffered facts, we find no merit to Hammer's argument that the aggravating factor as applied to him is unconstitutional.

ACCORDINGLY, IT IS HEREBY ORDERED THAT:

Hammer's motion to strike the aggravating factor that the murder was committed in an especially heinous, cruel or depraved manner set forth at § B, ¶ 3, of the government's

notice of intent to seek the death penalty (Motion No. 5 filed August 1, 1997, Doc. 140) is denied.

### ORDER
September 25, 1997.

THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

On September 18, 1996, a Grand Jury sitting in Williamsport, Pennsylvania returned an indictment charging Defendant David Paul Hammer with first degree murder. On April 9, 1997, the government filed a notice of its intent to seek the death penalty in this case. This case is on the January, 1998, trial list. On August 1, 1997, Hammer filed twelve pretrial motions. Those motions are fully briefed and are ripe for disposition.

This order addresses Motion No. 6 filed on August 1, 1997, in which Hammer requests that the non-statutory aggravating factors set forth in the government's notice of intent to seek the death penalty be stricken from the notice. The government sets forth in the notice three categories of non-statutory aggravating factors: (1) participation in additional, uncharged murders, attempted murders, or serious acts of violence, (2) future dangerousness of Hammer, and (3) victim impact evidence.

The Federal Death Penalty Act of 1994 is a weighing statute, i.e., a jury in deciding whether to impose the death penalty is to weigh the aggravating circumstances and mitigating circumstances and only impose the death penalty if the aggravating circumstances outweigh the mitigating circumstances. Relying on *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), Hammer argues that a weighing statute may not constitutionally resort to non-statutory aggravating factors without also providing for mandatory comparative proportionality review and, therefore, the Federal Death Penalty Act is not constitutional.

We find no merit in Hammer's argument. Comparative proportionality review in death penalty cases involves an appellate determination of whether or not a sentence of death in one case is arbitrary or capricious by comparing it to the sentences imposed in similar cases. See *Pulley v. Harris,* 465 U.S. 37, 43, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). The Constitution does not require proportionality review of death sentences. *Id.* In *Pulley v. Harris* the Supreme Court stated:

> [W]e did not hold [in Zant] that without comparative proportionality review the statute would be unconstitutional. To the contrary, we relied on the jury's finding of aggravating circumstances, not [an appellate court's] finding of proportionality, as rationalizing the sentence. Thus, the emphasis was on the constitutionally necessary narrowing function of statutory aggravating circumstances. Proportionality review was considered to be an additional safeguard against arbitrarily imposed death sentences, but we certainly did not hold that comparative review was constitutionally required.

465 U.S. at 50, 104 S.Ct. 871 (citations omitted).

Hammer does argue that *Pulley v. Harris* is limited to cases in which the sentence is based only upon statutory aggravating factors. This argument has been rejected by several district courts and we will, likewise, reject the argument. See, e.g., *United States v. Nguyen,* 928 F.Supp. 1525, 1537 (D.Kan.1996)(Belot, J.); *United States v. Bradley,* 880 F.Supp. 271 (M.D.Pa.1994)(Rambo, J.).

ACCORDINGLY, IT IS HEREBY ORDERED THAT:

Hammer's motion to strike the non-statutory aggravating factors from the government's notice of intent to seek the death penalty (Motion No. 6 filed August 1, 1997, Doc. 142) is denied.

### ORDER # 1 of
September 26, 1997.

THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

On September 18, 1996, a Grand Jury sitting in Williamsport, Pennsylvania returned an indictment charging Defendant David Paul Hammer with first degree murder. On April 9, 1997, the government filed a notice of its intent to seek the death penalty in this

case. This case is on the January, 1998, trial list. On August 1, 1997, Hammer filed twelve pretrial motions. Those motions are fully briefed and are ripe for disposition. This order relates solely to motion # 7 filed August 1, 1997.

Because the government is seeking the death penalty the trial scheduled for January will be a bifurcated proceeding. If the jury finds Hammer guilty of the charge of murder, the jury then must determine whether he should receive the death penalty. This determination requires that the jury pass through several stages. Initially, the jury must determine whether Hammer had the requisite "intent" in committing the offense. 18 U.S.C. § 3591(a)(2). If the jury determines beyond a reasonable doubt that Hammer had at least one of the required "intent" factors set forth in § 3591(a)(c), the jury proceeds to the second stage. However, if they do not find the requisite intent, the deliberation are over and the death penalty cannot be imposed.

If the jury reaches the second stage of the death penalty phase, the jury must consider any statutory aggravating factors. 18 U.S.C. § 3592(c). For the death penalty to be imposed, the jury must find that the government has proven beyond a reasonable doubt at least one statutory aggravating factor. If they so find, they proceed to the next stage. If they do not find at least one statutory aggravating factor, they cannot impose the death penalty.

The third stage involves the jury weighing the statutory and non-statutory aggravating factors [1] for which notice has been provided against any mitigating factors and deciding whether the aggravating factors outweigh all the mitigating factors found to exist. "Based upon this consideration, the jury by a unanimous vote" shall either recommend death or life imprisonment. 18 U.S.C. § 3593(e).

In Motion No. 7 filed on August 1, 1997, Hammer requests that the non-statutory aggravating factors set forth in the government's notice of intent to seek the death penalty be stricken on the ground that Congress may not delegate to the executive the authority to determine aggravating factors.

Several courts have considered and rejected this non-delegation argument. *United States v. McCullah*, 76 F.3d 1087, 1106–07 (10th Cir.1996); *United States v. Bradley*, 880 F.Supp. 271, 283–84 (M.D.Pa.1994)(Rambo, J.); *United States v. Pitera*, 795 F.Supp. 546, 562 (E.D.N.Y.1992)(Raggi, J.). We are persuaded by those cases. Congress did not impermissibly delegate legislative authority when it enacted the Federal Death Penalty Act. The function of the prosecutor in identifying non-statutory aggravating factors under that Act is "an exercise in advocacy derived from the executive's discretion to prosecute, not the legislature's power to fix punishment." *United States v. Pitera*, 795 F.Supp. at 563. Thus, "[i]n identifying non-statutory aggravating factors pursuant to [the statute], the prosecution plays virtually the same role in a capital sentencing proceeding as it does in a non-capital one." *Id.* at 562.

In conclusion, we note that "the statutory aggravating factors themselves provide a ready framework for determining Congressional intent and for evaluating the relevance and admissibility of the proposed nonstatutory aggravating factors." *United States v. Davis*, 912 F.Supp. 938, 944 (E.D.La.1996).

---

1. In our order # 1 of September 19, 1997, addressing Hammer's motion # 2 filed August 1, 1997, we stated:

It appears that there is a dispute as to whether the "intent" factors set forth in § 3591(a)(2) can be considered by the jury during the penalty phase as aggravating factors that should be weighed against any mitigating factors. This is a matter that need not be decided prior to trial. However, the court is dubious whether the "intent" factors set forth in § 3591(a)(2) can be considered aggravating factors.

We have found from further research that the "intent" factors set forth in 18 U.S.C. § 3591(a)(2) are not referred to in the statute as "aggravating factors" and, therefore, conclude that the "intent" factors cannot be considered by the jury during the weighing process. Cf. *United States v. McCullah*, 76 F.3d 1087, 1109 (10th Cir.1996)(in considering a murder charge under the continuing criminal enterprise statute, 21 U.S.C. § 848, the court found it dispositive that the "intent" factors of that statute were specifically referred to in the statute as aggravating factors).

ACCORDINGLY, IT IS HEREBY ORDERED THAT:

Hammer's motion to strike the non-statutory aggravating factors from the government's notice of intent to seek the death penalty on the ground that Congress may not delegate to the executive the authority to determine aggravating factors (Motion No. 7 filed August 1, 1997, Doc. 144) is denied.

## ORDER # 2 of

September 26, 1997.

THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

On September 18, 1996, a Grand Jury sitting in Williamsport, Pennsylvania returned an indictment charging Defendant David Paul Hammer with first degree murder. On April 9, 1997, the government filed a notice of its intent to seek the death penalty in this case. This case is on the January, 1998, trial list.

On August 1, 1997, Hammer filed twelve pretrial motions. Those motions are fully briefed and are ripe for disposition. This order addresses Motion No. 8 filed on August 1, 1997, in which Hammer requests that the non-statutory aggravating factors set forth in the government's notice of intent to seek the death penalty unrelated to "victim impact" be stricken from that notice.

Several courts have permitted the use of non-statutory aggravating factors other than "victim impact" evidence. *United States v. McCullah,* 76 F.3d 1087, 1106–12 (10th Cir. 1996); *United States v. Davis,* 912 F.Supp. 938, 944–45 (E.D.La.1996); *United States v. Bradley,* 880 F.Supp. 271, 283–84 (M.D.Pa.1994)(Rambo, J.). We are persuaded by those cases. Hammer's motion will be denied.

ACCORDINGLY, IT IS HEREBY ORDERED THAT:

Hammer's motion to strike the non-statutory aggravating factor from the government's notice of intent to seek the death penalty other than relating to "victim impact" (Motion No. 8 filed August 1, 1997, Doc. 150) is denied.

## ORDER

September 30, 1997.

THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

On September 18, 1996, a Grand Jury sitting in Williamsport, Pennsylvania returned an indictment charging Defendant David Paul Hammer with first degree murder. On April 9, 1997, the government filed a notice of its intent to seek the death penalty in this case. This case is on the January, 1998, trial list. On August 1, 1997, Hammer filed twelve pretrial motions. Those motions are fully briefed and are ripe for disposition.

This order addresses Motion No. 9 filed on August 1, 1997, in which Hammer requests that certain non-statutory aggravating factors and proffered evidence in support of those factors set forth in the government's notice of intent to seek the death penalty be stricken from the notice. The government sets forth in the notice three categories of non-statutory aggravating factors: (1) participation in additional, uncharged murders, attempted murders, or serious acts of violence (see § C, ¶ 1), (2) future dangerousness of Hammer (see § C, ¶ 2), and (3) victim impact evidence (see § C, ¶ 3).

The Federal Death Penalty Act of 1994 is a weighing statute, i.e., a jury in deciding whether to impose the death penalty is to weigh the aggravating circumstances and mitigating circumstances and only impose the death penalty if the aggravating circumstances outweigh the mitigating circumstances. Under a weighing statute aggravating factors may not be alleged in duplicative fashion. See *United States v. McCullah,* 76 F.3d 1087, 1111–12 (10th Cir.1996). However, multiple reference to one situation or circumstance is not impermissible as long as there is at least one non-duplicative element or aggravating circumstance brought out that genuinely narrows the class of defendants eligible for the death penalty. *Lowenfield v. Phelps,* 484 U.S. 231, 244–46, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988).

With regard to the first non-statutory aggravating factor set forth in the government's notice, participation in additional, uncharged murders, attempted murders, or

other serious acts of violence, Hammer objects to the repetitive use of a 1984 conviction for shooting with intent to kill. On September 9, 1984, Hammer was convicted by a jury in Oklahoma City, Oklahoma, of shooting with intent to kill a man named Thomas Upton. Hammer shot Mr. Upton in the head, three times. Mr. Upton survived the shooting and testified against Hammer at his trial.

The Thomas Upton shooting is utilized by the government to support two statutory and two non-statutory aggravating factors. First, the Upton shooting is alleged to support the statutory aggravating factor set forth in § B, ¶ 1 of the notice. In § B, ¶ 1 of the notice, the government set forth three previous convictions where allegedly a firearm was used.[1] Second, the Upton shooting is utilized to support the statutory aggravating factor set forth in § B, ¶ 2 of the notice. In that paragraph, the government set forth two convictions that allegedly involved the infliction or attempted infliction of serious bodily injury upon another person. The aggravating factor set forth in ¶ 2 was stricken by order # 3 of September 19, 1997, because the statute, 18 U.S.C. § 3593(c)(3), requires two convictions involving the infliction or attempted infliction of serious bodily injury and one of the convictions set forth by the government did not involve that type of conduct. Third, the Upton shooting is alleged to support the non-statutory aggravating factor set forth in § C, ¶ 1, of the notice. Section C, ¶ 1 of the notice, relates to Hammer's purported "[p]articipation in additional, uncharged murders, attempted murder, or other serious acts of violence." To support this non-statutory aggravating factor the government relies in part, in sub-¶ a, on the Upton shooting.

The government correctly notes that not every offense involving the use or attempted

or threatened use of a firearm results in injury to an individual. We agree that injury to an individual during a firearm offense could be a separate non-statutory aggravating factor. However, the government refers in § C, ¶ 1, to "additional, uncharged" or "other serious acts of violence." The Uptown shooting was previously designated in the notice as supporting the statutory aggravating factor that Hammer had previously been convicted of an offense involving the use or attempted or threatened use of a firearm. Therefore, it cannot be an "additional, uncharged" or "other serious act of violence."[2]

Hammer also objects to use of the uncharged homicide of a Mr. Kenner set forth in § C, ¶ 1, sub-¶ b of the notice. That subparagraph states:

> Additionally, Hammer, although incarcerated at the time in the Oklahoma Department of Corrections, urged a person in the community to rob and, if necessary, kill Kenneth B. Kenner, a person with whom he had telephone communication and correspondence, in Louisville, Tennessee. In fact, Kenner was killed on November 23, 1986. Hammer confessed to his involvement in the offense during an interview on December 18, 1986, by Oklahoma and Tennessee law enforcement officials. No federal or state charges were brought against him notwithstanding his admission.

The government's use of the uncharged homicide is complicated by its recently filed motion to amend the notice of intent to seek the death penalty. In that motion the government states that "[i]t appears that Hammer may have wrongfully admitted his involvement in Kenner's death by implicating two individuals who did not commit the offense." The government goes on to state that "[n]otwithstanding the fact that Hammer may not have actually precipitated the murder, it is submitted that [Hammer's] videotaped admission is probative of his fu-

---

1. By order of # 2 of September 19, 1997, one of those convictions was stricken from the notice because it involved the use of a knife instead of a firearm.

2. A conviction involving the use or attempted or threatened use of a firearm is a statutory aggravating factor under 18 U.S.C. § 3592(c)(2). Two

convictions for the use or attempted or threatened use of a firearm are set forth in § B, ¶ 1, of the government's notice of intent to seek the death penalty. We do not see that the government is precluded from presenting the circumstances surrounding those offenses during the penalty phase.

ture dangerousness ...." The motion to amend the notice is not ripe for disposition and we will address that motion in due course. However, at this time we will strike ¶ 1, sub-¶¶ a and b, of § C of the government's notice of intent to seek the death penalty.

Hammer also requests that certain portions of the notice of intent to seek the death penalty relating to his future dangerousness be stricken. Specifically, Hammer requests that the provisions regarding his "lack of remorse" and "threatening words and warped bravado" be stricken.

Future dangerousness to the lives and safety of other persons has been found to be a legitimate aggravating factor that a jury can consider during the penalty phase. *Jurek v. Texas,* 428 U.S. 262, 272, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *United States v. Davis,* 912 F.Supp. 938, 945 (E.D.La.1996).

Hammer relies on the case of *United States v. Davis* for the proposition that reference to his "lack of remorse" should be stricken. In *Davis,* the government listed "lack of remorse" as a separate aggravating factor. The district court in *Davis* did not permit the government to use "lack of remorse" as a separate aggravating factor. However, the court did not foreclose the use of "lack of remorse" as probative of "future dangerousness." The government in *Davis* proposed to present evidence of the defendant's "alleged jubilation in learning that [the victim] had been killed." *Id.* at 946. The district court held that "[w]hile the government may not assert "lack of remorse" as an independent nonstatutory aggravating factor, it may argue DAVIS' alleged exultation as information of DAVIS' future dangerousness, ...." *Id.* We will, therefore, deny Hammer's motion to strike the portions of the notice referring to his lack of remorse and boastful statements.

ACCORDINGLY, IT IS HEREBY ORDERED THAT:

1. Hammer's motion to strike specific non-statutory aggravating factors from the government's notice of intent to seek the death penalty (Motion No. 9 filed August 1, 1997, Doc. 152) is granted in part and denied in part.

2. Paragraph 1, Subparagraphs a and b, of Section C of the government's notice of intent to seek the death penalty are stricken from the notice.

3. In all other respects Hammer's motion is denied.

*ORDER # 1 of*
October 7, 1997.

THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

On September 18, 1996, a Grand Jury sitting in Williamsport, Pennsylvania returned an indictment charging Defendant David Paul Hammer with first degree murder. On April 9, 1997, the government filed a notice of its intent to seek the death penalty in this case. This case is on the January, 1998, trial list. On August 1, 1997, Hammer filed twelve pretrial motions. Those motions are fully briefed and are ripe for disposition.

This order addresses Motion No. 10 filed on August 1, 1997, in which Hammer requests that the aggravating factors set forth in the government's notice of intent to seek the death penalty be dismissed on the ground that his capital prosecution is arbitrary and capricious. In essence the motion is a motion to strike the government's notice of intent to seek the death penalty and will be referred to as such. Hammer argues that "[t]here have been numerous murders by inmates of inmates, at Bureau of Prisons institutions since ... the effective date of the [Federal Death Penalty Act]" and "[o]nly a small handful of these have been handled as death-penalty cases." Without any other basis for support, the defendant concludes that "Mr. Hammer has been singled out for exposure to the death penalty in an arbitrary manner" and that "[s]uch arbitrariness violates the Eighth and Fifth Amendment."

The decision to prosecute, including the decision to seek the death penalty, rests with the prosecutor. See *Wayte v. United States,* 470 U.S. 598, 607, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985); *United States v. Nguyen,* 928 F.Supp. 1525, 1544–45 (D.Kan.1996)(Belot, J.); *United States v. Bradley,* 880 F.Supp. 271, 279–81, 291 (M.D.Pa.1994)(Rambo, J.);

*United States v. Pretlow,* 779 F.Supp. 758, 777 (D.N.J.1991)(Raggi, J.). The mere fact that the government has only sought the death penalty in a de minimis number of murder cases involving federal inmates is not sufficient to demonstrate that the prosecution of Hammer is arbitrary and capricious. *Id.* More is required. Hammer must show that the government is seeking the death penalty for an impermissible reason, such as race, religion, or in retaliation for exercising his right to trial by jury. *Id.*

Moreover, a hearing on such a motion is "necessitated only when the motion alleges sufficient facts to take the question past the frivolous state and raises a reasonable doubt as to the prosecutor's purpose." *United States v. Eklund,* 733 F.2d 1287, 1290 (8th Cir.1984), cert. denied, 471 U.S. 1003, 105 S.Ct. 1864, 85 L.Ed.2d 158 (1985) (citations omitted). Hammer has failed to proffer any evidence from which it can be concluded that the government is seeking the death penalty for an impermissible reason.

ACCORDINGLY, IT IS HEREBY ORDERED THAT:

Hammer's motion to strike the government's notice of intent to seek the death penalty (Motion No. 10 filed August 1, 1997, Doc. 154) is denied.

## ORDER # 2 of
October 7, 1997.

THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

On September 18, 1996, a Grand Jury sitting in Williamsport, Pennsylvania returned an indictment charging Defendant David Paul Hammer with first degree murder. On April 9, 1997, the government filed a notice of its intent to seek the death penalty in this case. This case is on the January, 1998, trial list. On August 1, 1997, Hammer filed twelve pretrial motions. Those motions are fully briefed and are ripe for disposition.

This order addresses Motion No. 11 filed August 1, 1997, in which Hammer requests that the aggravating factors set forth in the government's notice of intent to seek the

death penalty be dismissed on the ground that the relaxed evidentiary standard available to the government at the penalty hearing does not allow for a reliable jury determination. In essence the motion is a motion to strike the government's notice of intent to seek the death penalty and will be referred to as such.

Hammer contends that 18 U.S.C. § 3593(c) is unconstitutional because it impermissibly allows presentation of unreliable evidence at the penalty phase hearing. That provision provides in relevant part as follows:

> At the sentencing hearing, information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor permitted or required to be considered under section 3592. Information presented may include the trial transcript and exhibits if the hearing is held before a jury or judge not present during the trial, or at the trial judge's discretion. The defendant may present any information relevant to a mitigating factor. The government may present any information relevant to an aggravating factor for which notice has been provided .... Information is admissible regardless of its admissibility under the rules governing the admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.

We are satisfied that the standard set forth in the foregoing provision is not so unreliable as to be unconstitutional. Several court have rejected the same argument made with respect to 21 U.S.C. § 848(j), a substantially similar provision. One court stated that "in many circumstances reference to the Federal Rules of Evidence will be useful in deciding whether information proffered at a capital sentencing hearing is sufficiently reliable to be more probative than prejudicial. The Rules will not, however, be determinative.... The heightened standard applicable to capital sentencing proceeding may ... demand further indicia of reliability before a court can say that the probative value of [certain evidence] outweighs its prejudicial

potential." *United States v. Pitera,* 795 F.Supp. 546, 565 (E.D.N.Y.1992)(Raggi, J.). The court in *Pitera* in rejecting defendant's challenge to the statute's evidentiary standard concluded that the Constitution required "heightened reliability" of evidence presented during the death penalty phase of the trial and that "such a standard can adequately be factored into a consideration of whether proffered evidence is more probative than prejudicial." Id. at 566; see also *United States v. Bradley,* 880 F.Supp. 271, 291 (M.D.Pa.1994)(Rambo, J.)(evidentiary standard applicable to penalty phase of proceeding under continuing criminal enterprise statute's death penalty provision requiring exclusion of evidence relating to aggravating and mitigating factors only if its probative value was substantially outweighed by danger of unfair prejudice did not unconstitutionally curtail reliability of sentencing proceeding).

ACCORDINGLY, IT IS HEREBY ORDERED THAT:

Hammer's motion to strike the government's notice of intent to seek the death penalty on the ground that the relaxed evidentiary standard available to the government at the penalty phase does not allow for a reliable jury determination (Motion No. 11 filed August 1, 1997, Doc. 146) is denied.

*ORDER # 1 of*
October 9, 1997.

THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

On September 18, 1996, a Grand Jury sitting in Williamsport, Pennsylvania returned an indictment charging Defendant David Paul Hammer with first degree murder. On April 9, 1997, the government filed a notice of its intent to seek the death penalty in this case. This case is on the January, 1998, trial list. On August 1, 1997, Hammer filed twelve pretrial motions. Those motions are fully briefed and are ripe for disposition. This order addresses Motion No. 12 filed August 1, 1997, in which Hammer requests that the indictment be dismissed because of alleged misconduct by the prosecutor before the grand jury.

The indictment in this case originally consisted of two counts. Count I charged Hammer pursuant to 18 U.S.C. § 1111 with murder within the special maritime and territorial jurisdiction of the United States. Count II charged Hammer pursuant to 18 U.S.C. § 1118 with murder by a federal inmate serving a sentence of life imprisonment. On April 25, 1997, Count II of the indictment was dismissed on motion of the government. Hammer alleges that the prosecutor committed misconduct by misleading the grand jury into believing that Hammer was serving a life sentence and that because of this erroneous and prejudicial presentation, the indictment should be dismissed.

We have reviewed relevant portions of the transcript of the Grand Jury proceeding in this case. The Grand Jury twice heard information about sentences which Hammer was serving. At both instances the prosecution did not refer to the types of offenses for which Hammer was convicted of in Oklahoma. To support the now dismissed Count II of the Indictment the Grand Jury was advised that the aggregate sentences which Hammer received from his various convictions in Oklahoma totalled 1232 years. Although under Oklahoma state law Hammer was only serving at the time of the murder a five year term of incarceration, he was obliged to serve substantial consecutive terms of imprisonment in excess of 1200 years.

Hammer cites the Supreme Court's decision in *Costello v. United States,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956) and the Court of Appeals for the Third Circuit's decision in *United States v. Serubo,* 604 F.2d 807 (3d Cir.1979) in support of his claim that the indictment should be dismissed. However, neither case calls for the dismissal of the indictment in this case [1] and Hammer fails to cite the more recent precedents of *Bank of*

---

1. The prosecutor in the *Serubo* case engaged in egregious and reprehensible conduct, including an attempt to link the defendants with organized crime without laying any evidentiary foundation.

604 F.2d at 815. As for the *Costello* case, it stands for the proposition that a criminal defendant has a right to an unbiased grand jury.

*Nova Scotia v. United States,* 487 U.S. 250, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988) and *United States v. Soberon,* 929 F.2d 935 (3d Cir.1991).

In *Soberon* the Court of Appeals for this circuit set forth the standard of review:

> *Bank of Nova Scotia v. United States* . . . established the standard for dismissing an indictment based on error in a grand jury proceeding. The Supreme Court held in *Bank of Nova Scotia* that a district court is bound by the doctrine of "harmless error" and may not dismiss an indictment on the basis of prosecutorial misconduct before the grand jury without making a factual finding that the defendant was prejudiced by that misconduct. To find prejudice, the district court must establish that " 'the violation substantially influenced the grand jury's decision to indict,' or . . . there is 'grave doubt' that the decision to indict was free from the substantial influence of such violation."

929 F.2d at 939–40 (citations omitted). Hammer was found in his cell with the victim, Andrew Marti, at 3:00 a.m., on April 13, 1996. The victim was tied spread-eagled, face down and strangled with a cloth cord. Thus, even if incorrect information was presented to the grand jury regarding Hammer's sentences imposed in Oklahoma, we conclude that the error had no impact whatsoever on the grand jury's decision to return a true bill as to Count I of the indictment.

Although technically he was serving a five year sentence at the time of the murder, his consecutive 1232 year sentence imposed in 1984 did not disappear. It is clear from the transcripts of the grand jury proceedings that the prosecutor limited the information regarding the nature of Hammer's prior convictions even in the face of curious members of the grand jury. Given the discovery and circumstances surrounding Andrew Marti's death at 3:00 a.m. in a two-man cell in the Special Housing Unit at USP–Allenwood, Hammer clearly was not prejudiced by referring to his 1232 year sentence. Furthermore, we are not convinced that a 1232 year sentence is less than a life sentence.

ACCORDINGLY, IT IS HEREBY ORDERED THAT:

Hammer's motion to dismiss the indictment (Doc. 156) is denied.

### APPENDIX D

### *ORDER*

May 8, 1998.

THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

Hammer challenged juror Robert D. Herr for cause because of Mr. Herr's opinion regarding the death penalty. The court understood Hammer's challenge to be based on his concern that Mr. Herr would start from the position that the death penalty should be imposed and require the defense to move him away from that position. The court finds based on Mr. Hartman's answers to the voir dire questions and his demeanor that his opinions or beliefs regarding the death penalty would not prevent or substantially impair the performance of his duties in accordance with the court's instructions and his oath, and he can set aside any opinion he might hold regarding the death penalty and decide the case based on the evidence presented and the law as given by the court. See *Wainwright v. Witt,* 469 U.S. 412, 423–426, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). We will overrule Hammer's challenge for cause.

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

Hammer's challenge for cause to Mr. Herr is overruled.

### *ORDER*

May 27, 1998.

THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

Defendant Hammer challenged juror Leslie F. Riggs for cause because of his views on the death penalty. We are satisfied that Mr. Riggs will in accordance with the court's instructions give appropriate consideration during the penalty phase to any mitigating factors presented by Mr. Hammer, including evidence that Mr. Hammer was sexually abused during his childhood and that he suf-

fers from various mental health problems. Mr. Riggs indicated that a finding of future dangerousness would "sway him in the direction" of the death penalty. However, we are satisfied that Mr. Riggs will not automatically impose a sentence a death if the government proves beyond a reasonable doubt that Mr. Hammer will pose a future danger to prison guards, other inmates or society but will weigh all the evidence presented including evidence of any mitigating factors. We were impressed by Mr. Rigg's sincerity when he stated he would consider all the evidence and that human life is sacred. We are convinced that Mr. Riggs will consider all the evidence and evaluate the evidence in accordance with the court's instructions.

The court finds based on the answers of Mr. Riggs to the voir dire questions and his demeanor that (1) he is not impermissibly biased in favor of the death penalty, (2) his opinions or beliefs would not prevent or substantially impair the performance of his duties in accordance with the instructions given him and in accordance with his oath, and (3) he can set aside any opinion he might hold regarding the death penalty and decide the case based on the evidence presented and the law as given by the court. See *Wainwright v. Witt,* 469 U.S. 412, 423–426, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).

Mr. Rigss's answers to questions 47, 48, 49, 53, 54, 56, 58, 68, 73 and 81 of the Juror Questionnaire support this court's conclusion that he is qualified to serve as a juror in this case. We are satisfied that Mr. Riggs's answers on the questionnaire and his oral answers in court are truthful. Moreover, we are satisfied that Mr. Riggs would be able faithfully and impartially to apply the law as given to him by us. This order reduces to writing our oral order from the bench overruling Hammer's challenge for cause.

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

Hammer's challenge for cause to juror Riggs is overruled.

### ORDER
May 22, 1998.

THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

Defendant Hammer challenged juror Margaret Ann Meabon for cause on the basis that she was exposed to a newspaper article that indicated the length of sentence Hammer is serving. Mrs. Meabon overheard a discussion relating to the newspaper article. However, she does not recall the exact number of years that was mentioned in the article, other than it was possibly a 100 years or a long time. Mrs. Meabon was asked if she could disregard what she heard and she indicated she could put what she heard out of her mind. She further stated that this was a separate case and she could keep an open mind.

The type of information that Mrs. Meabon overheard, i.e., a long sentence and "a 100 years," is the type that can be disregarded. We are satisfied based on Mrs. Meabon's answers and her demeanor that she will disregard what she heard and that she will be able faithfully and impartially to apply the law as given to her by us and base her decision solely on the evidence presented during the trial. The court will note for the record that Mrs. Meabon appeared very sincere when answering the questions of the court and counsel. This order reduces to writing our oral order from the bench overruling Hammer's challenge for cause.

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

Hammer's challenge for cause to juror Meabon is overruled.

### ORDER
May 12, 1998.

THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

The government challenged juror Manga Alagiriswami for .cause. Juror Alagiriswami answered questions 43, 44 and 45 of the Juror Questionnaire in a potentially disqualifying manner. Her answer to question 45 reveals that the fact that this case involves a murder charge would affect her ability to

serve as a juror. Her answer to question 46 indicates that the viewing of photographs of the body of the victim would affect her ability to serve as a juror. Her answer to question 47 reveals that she would have difficulty following the court's instructions on the law. In answering question 73 she stated:

G. I feel that my view against capital punishment will make it difficult for me to perform my duty as a juror to reach a verdict based on the facts and the law in the case.

H. I am strongly opposed to the death penalty. I will have a difficult time being fair.

Furthermore, although question 73 gave her the opportunity to state that she believed she could "follow the law providing for the imposition of the death penalty," she failed to do so. More importantly, in response to a question from government counsel in court she stated that she has opposed the death penalty for thirty years and is not sure she could follow the court's instructions on the law.

Juror Alagiriswami did not give a clear answer to this court's question as to whether she would refuse to vote for a death sentence under any circumstances. In essence she answered the question by stating she was opposed to the death penalty. Although defense counsel asked a question as to whether she could consider the death penalty and she responded that she would consider the options, she did not indicate that her beliefs and opinions regarding the death penalty would not prevent her from voting for the death penalty if the facts and circumstances justified its imposition.

The court finds based on the answers of the juror to the voir dire questions and the demeanor of the juror when answering questions in court that (1) the juror is impermissibly biased against the death penalty, (2) the juror's opinions or beliefs would prevent or substantially impair the juror's performance of the juror's duties in accordance with the instructions to the juror and the oath of the juror, and (3) the juror cannot set aside any opinion the juror might hold regarding the death penalty and decide the case on the evidence and the law as given by the court.

See *Wainwright v. Witt,* 469 U.S. 412, 423–426, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). This court has the definite impression that juror Alagiriswami would be unable faithfully and impartially to apply the law. *Id.* This order reduces to writing our oral order from the bench sustaining the government's challenge for cause.

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1. The government's challenge for cause is sustained.

2. Juror Alagiriswami is excused for cause.

/s/ Muir
 MUIR, U.S. District Judge